# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ADRIANA COSA,

Petitioner,

v.

MICHAEL B. MUKASEY, Attorney
General,

Respondent.

No. 04-75643

Agency No.
A95-591-594

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
June 11, 2008—San Francisco, California

Filed September 15, 2008

Before: M. Margaret McKeown and Ronald M. Gould,
Circuit Judges, and George P. Schiavelli,* District Judge.

Opinion by Judge McKeown

---

*The Honorable George P. Schiavelli, United States District Judge for
the Central District of California, sitting by designation.

**COUNSEL**

Jagdip Singh Sekhon, Oakland, California, for the petitioner.

Thomas H. Dupree, Jr., and Judith Reed, United States Department of Justice, Civil Division, for the respondent.

**OPINION**

McKEOWN, Circuit Judge:

This case highlights the importance of evidence rather than speculation and conjecture as the basis for an adverse credibility finding in immigration proceedings. Adriana Cosa's asylum petition was predicated on her claim of religious persecution in Romania as a consequence of practicing the Mil-

lenist faith. Millenism is neither a household word nor a major world religion. And therein lies the rub. The record is filled with the Immigration Judge's ("IJ") speculation about the faith — on everything from how Cosa should dress and wear her hair to comport with her beliefs to what books of the Bible are most important — and the IJ's disdain for Cosa's religious beliefs. Absent from the record is any evidence supporting the IJ's perceived view of Millenism. That Millenism may be an obscure, non-mainstream religion is no basis to discount a believer's faith. Whether Cosa suffered religious persecution has yet to be established. But one thing is for sure — she is entitled to have her immigration proceedings free of religious taint and bias. Because substantial evidence does not support the adverse credibility finding, we grant the petition, vacate the finding, and remand for further proceedings.

## I.  Factual and Procedural Background[1]

Adriana Cosa fled Romania for the United States in August 2001. Cosa later sought asylum and withholding of removal on the grounds of religious persecution. In her application, Cosa alleged that she was harassed, beaten, and raped by Romanian police for practicing her Millenist faith. Millenism is, according to Cosa, a Christian religion focused on the second coming of Christ and the end of human history. Cosa, whose family is Orthodox Christian, converted to Millenism in May of 2000 and was baptized soon after.

Millenism is not an officially recognized religion in Romania. As a consequence, the Romanian government does not allow Millenists to receive state funds or build places of worship. Nevertheless, Cosa and other followers practiced their faith by hosting and attending weekly religious meetings, and through evangelical activities, such as going door-to-door to raise awareness of the religion. Aside from the Bible, Millen-

---

[1]This factual background is based on Cosa's testimony and the declarations from her fellow Millenist worshipers.

ists in Romania do not use printed literature when they evangelize.

Villagers did not always respond favorably to the Millenists' evangelical efforts. Indeed, Cosa reports that villagers threw bottles and rocks at them and asked them to leave their villages forever. Romanian police witnessed these events and laughed, but offered no protection. In July 2001, Cosa was holding a religious meeting in her apartment when the police arrived and broke it up. The police called Cosa and her guests heretics, accused them of conducting an unauthorized religious gathering, and ordered Cosa to stop holding meetings. The police returned later that night, threatened Cosa again, and forced her to pay a fine. A week later, the police interrupted another Millenist meeting at Cosa's apartment, again called her a heretic, then beat her guests, and forced them to leave the apartment. When Cosa refused to pay a second fine, the police threw her to the ground, kicked, beat, and raped her until she passed out. As they beat and raped her, the officers used religious slurs against Cosa, calling her a "heretic whore." The police returned the next day and threatened her with further harm if she told anyone about what happened. Cosa left for the United States soon after these events.

Before her first hearing in January 2003, Cosa submitted declarations from fellow Millenists corroborating her claim of religious persecution. She also submitted a medical certificate verifying that she had been raped. Cosa was the only witness at the hearing. In response to the IJ's questioning about her religion, Cosa followed up with a declaration from the leader of the Millenists in her village. The statement corroborated the existence of Millenism, verified that Cosa was an active practitioner of Millenism, and stated that Cosa left Romania because of trouble with the police. Cosa also submitted information about country conditions in Romania.

A second hearing was held in April 2003. The IJ expressed skepticism about Cosa's religious beliefs and the attacks that

Cosa reported. The IJ made an adverse credibility determination and found that she could not accept Cosa's testimony as credible without additional corroborating evidence, deeming insufficient the declaration from the Millenist leader. The IJ also found Cosa's other evidence, including the declarations from the other Millenists, insufficient to overcome the IJ's doubts about Cosa's testimony.

On the basis of the adverse credibility determination, the IJ denied Cosa's request for asylum and her request for withholding of removal. The BIA affirmed the IJ's decision, concluding the credibility determination was not clearly erroneous.

## II. ANALYSIS

[1] It is no surprise that the IJ was not familiar with the Millenist faith. Millenism is hardly a textbook religion. To her credit, the IJ undertook independent research and included her findings as an exhibit in the record. Nonetheless, the IJ put Cosa in an impossible box. The IJ discounted Cosa's credibility based on the IJ's conjectural view of how a Millenist should act and think, and then faulted Cosa for not providing corroborating evidence about the religion.[2] Though very little is written about the Millenist faith — indeed, Cosa never received any published pamphlets or brochures — "[s]peculation and conjecture cannot form the basis of an adverse credibility finding, which must instead be based on substantial evidence." *Yan Xia Zhu v. Mukasey*, No. 06-72967, 2008 WL 2925124, at *3 (9th Cir. July, 31, 2008) (internal citations and quotations omitted) (holding IJ's speculation about how a rape victim would act did not support adverse credibility finding).

---

[2]Where, as here, the BIA reviews an IJ's determination under a deferential standard, we review the IJ's decision. *de Leon-Barrios v. INS*, 116 F.3d 391, 393 (9th Cir. 1997). We review the IJ's findings of fact for substantial evidence, and must uphold them unless the evidence compels a contrary result. *Id.*

The IJ's conjecture is best illustrated by examining the decision itself. At the outset, the IJ criticized Cosa's dress and demeanor:

> Respondent's physical appearance in Court has consistently been severe in terms of her tailored dress, her hair style, and her manner.

Continuing, the decision notes that:

> [t]he thing [Cosa] was most impressed with was the essential softness, love and acceptance and friendliness of the people in the faith. This respondent does not emote that type of lifestyle or approach that most attracted herself into this religion.

[2] The record is bare of any evidence of how a Millenist might dress, how much one might laugh or smile as a Millenist, or what haircut is appropriate. Indeed, it is not uncommon for litigants, on advice of counsel, to wear conservative clothing to court. Does the fact that a religion promotes love and friendliness mean the adherents cannot wear tailored clothing? What dress would be appropriate — a flowing gown, a tie-dyed shirt, or a suit with soft lines? The IJ's commentary was not a credibility finding based on demeanor but instead stemmed from pure speculation about how a Millenist might look and act.[3] *Cf. Ali v. Mukasey*, 529 F.3d 478, 491-92 (2d Cir. 2008) (concluding IJ impermissibly relied on preconceived assumptions about homosexuality and homosexuals).

---

[3]The lack of evidence about Millenists' dress and clothing stands in contrast to the well known identification of some adherents to other religions, such as the Amish, with particular dress. *See* ENCYCLOPEDIA OF WORLD CULTURES, VOL. 1, 20 (1994) ("Family and community may therefore overlook . . . young people . . . wearing non-Amish clothes."); THE OXFORD DICTIONARY OF WORLD RELIGIONS 59 (1997) ("The 'Old Order' Amish . . . retain[ ] the dress and customs of that early period: beards and broad-brimmed hats for men, bonnets and aprons for women.").

The IJ's same vision was reflected later in the decision. Commenting first on Cosa's testimony, the IJ noted:

> The Respondent described the Millenist organization as believing in the Father, Son, and Holy Spirit and the second coming of Jesus and that there will be eternal life for believers and internal [sic] punishment for everyone else when the judgment day comes. Respondent testified for a thousand years Satan will rule and have no one to test him and that eventually God will send fire to earth and destroy everything related to sin and a new earth will be created with a new space for Jesus' followers.

**[3]** Belittling this testimony, the IJ then concluded that "[t]his vision of the future does not reflect love and acceptance and a warm tolerance that this respondent seems to believe attracted her to this group." Again, the IJ supplants the actual testimony with her vision of the Millenist faith, a religion about which her knowledge comes from her own Internet research. *See Jiang v. Gonzales*, 485 F.3d 992, 995 (7th Cir. 2007) ("[A]n IJ's personal beliefs or some perceived common knowledge about the religion are not a proper basis for an adverse credibility finding.") (internal quotations and citations omitted). Her view amounts to nothing more than skepticism about the tenets of the Millenist faith. We rejected similar reasoning in *Gui v. I.N.S.*, overturning an adverse credibility finding based on the IJ's "own opinions as to how best to silence a dissident." 280 F.3d 1217, 1226 (9th Cir. 2002).

This same extrapolation of religious beliefs without foundation is found in yet another example later in the transcript. Cosa testified "that Millenism is an evangelical faith and what that means is you go out door to door to spread the word." Ignoring that Cosa used the term "evangelical" to mean essentially proselyting door to door, the IJ looked up the term in the dictionary and found it referenced "the preaching of the gospel, that is Matthew, Mark, Luke, John," and then faulted

Cosa for not knowing "what evangelism is." Although Cosa described Revelation as the most important book in the bible for Millenists and she identified four passages with particular reference to the apocalypse, the IJ belittled her credibility because when the IJ asked her to name the first four books of the New Testament, Cosa left Luke off of the list. This entire exchange evidenced the IJ's misapprehension of Cosa's testimony about evangelism.

The IJ also faulted Cosa for her inability to explain the relationship among Millenism and Russellism, Millenialism and Pre- and Post-Millenialism — references the IJ found on the Internet — but it is unclear why this academic comparison is relevant to verifying Cosa's beliefs. One can certainly adhere to a religion without understanding or being educated in its relation to all other religions, even those that are similar to it. *See Rizal v. Gonzales*, 442 F.3d 84, 90 (2d Cir. 2006) ("Both history and common sense make amply clear that people can identify with a certain religion, notwithstanding their lack of detailed knowledge about that religion's doctrinal tenets, and that those same people can be persecuted for their religious affiliation."); *Jiang*, 485 F.3d at 995 ("We have cautioned IJs against using an applicant's ignorance of religious doctrine as evidence that an individual is not a true believer.") (internal quotations and citations omitted).

Remarkably, the IJ set up a Bible quiz and an academic trivia contest as the foundation for the adverse credibility finding. Cosa claimed no expertise in Bible study or passages nor did she claim to have an intellectual's understanding of Millenism. *See Rizal*, 442 F.3d at 90 (explaining the distinction between an adherent and an expert, and that expecting academic knowledge of the religion from the former is unreasonable). Of course, it is not unfair to test the scope of a petitioner's understanding of her religion or even to challenge a preposterous claim, but to do so, as here, without a benchmark other than the IJ's views is unacceptable. *See id.* at 90-91.

Similarly, based on the IJ's own views of baptismal practice, the IJ deemed it "preposterous" that Cosa was baptized after only a short period of association with the religion. This conclusion, too, appears to be based on the IJ's personal and overly narrow conception of baptism, rather than on the record.

[4] The IJ's discussion of Millenism is riddled with skepticism and conjecture about the religion. True, with only 7,000 adherents in Romania, it is not a sizeable religion, nor is it a faith with which most people have passing familiarity. But the obscurity of the religion is not a license to speculate. Our precedent is unwavering that "non-evidence-based" assumptions cannot support an adverse credibility determination. *Ge v. Ashcroft*, 367 F.3d 1121, 1126 (9th Cir. 2004). "Without some evidence in the record, other than the IJ's bare personal view, we have no way of knowing whether the IJ's suspicions are simply conjecture or legitimate concerns bearing on" an applicant's credibility. *Lin v. Gonzales*, 434 F.3d 1158, 1163 (9th Cir. 2006).

[5] Ultimately, in example after example, the IJ doubted Cosa's credibility, not because of a true demeanor finding and not because her testimony was incredible or at odds with the evidence or widely-held facts about Millenism, but simply because Cosa's description did not comport with the IJ's newly-acquired notion of Millenism. *See Chukwu v. Attorney General*, 484 F.3d 185, 189 (3d Cir. 2007) ("The IJ's conclusions about what facts are or are not plausible must be based on the record, not on conjecture or unsupported suppositions."); *Jiang*, 485 F.3d at 995 (faulting IJ for basing credibility determination on IJ's personal beliefs about a religion and its teachings). This adverse credibility assessment infected the IJ's entire decision and led the BIA to affirm the IJ's demand for independent corroborative evidence. Similarly, the BIA's determination of the lack of persecution rested on the faulty credibility foundation.

**[6]** The requirement of corroborating evidence imposed by both the IJ and the BIA does not comport with our precedent. Corroborating evidence is appropriate when the IJ either "does not believe the applicant or does not know what to believe." *Sidhu v. INS*, 220 F.3d 1085, 1090 (9th Cir. 2000). Nonetheless, where the basis for an adverse credibility finding falls out, the lack of corroborating evidence cannot backstop the decision. We also note that Cosa provided multiple individualized declarations from fellow Millenists describing their worship routines and police harassment. Whether additional information would be readily available was not an issue addressed by either the IJ or the BIA.

**[7]** Because substantial evidence does not support the credibility finding, "we accept [Cosa's] testimony as true." *Singh v. Gonzales*, 439 F.3d 1100, 1111 (9th Cir. 2006). We grant the petition, vacate the adverse credibility finding, and remand to the BIA "for a consideration of factual [and other] questions that may be dispositive of the petition." *Id.* at 1112.

GRANTED AND REMANDED.