[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPT 27, 2010
JOHN LEY
CLERK

No. 09-11652

_____

Agency No. A096-279-269

MLADEN ZELJKO TODOROVIC,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(September 27, 2010)

Before BARKETT and MARCUS, Circuit Judges, and HOOD,[*] District Judge.

MARCUS, Circuit Judge:

_____

[*] Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Mladen Zeljko Todorovic petitions for review of the decision of the Board of Immigration Appeals ("BIA" or "Board") denying his applications for asylum and withholding of removal. Todorovic claimed that he was persecuted, for years and often violently, in his native Serbia on account of his sexual orientation. In removal proceedings before an Immigration Judge ("IJ"), Todorovic primarily offered his own testimony in support of his claims. In an oral opinion, the IJ held that the asylum petition was untimely, and that Todorovic was not a credible witness, so that his testimony could not support his claim for withholding. The BIA agreed with the IJ that the applicant was not a credible witness.

Todorovic claims that the agency's adverse credibility determinations are not supported by substantial evidence, and in actuality are based in large part on impermissible stereotypes about homosexuals wholly divorced from any evidential foundation. We agree with Todorovic that the IJ relied impermissibly on stereotypes about homosexuals, stereotypes which tainted the proceedings and prevent us from conducting a meaningful review of the agency decision. Accordingly, we grant Todorovic's petition for review, vacate the agency's decision, and remand the cause to the agency for further proceedings.

I.

Todorovic is a Serbian citizen who entered the United States as a member of the crew of a cruise ship on November 23, 2000. After living in South Florida for

around two years, he filed an application on January 30, 2003, for asylum and withholding of removal under the Immigration and Nationality Act ("INA") and the Convention Against Torture ("CAT"). In a hearing before an immigration judge, he testified about numerous acts of persecution he said he endured in Serbia, many of them at the hands of the government, on account of being homosexual. We briefly summarize that testimony.

Todorovic's difficulties began in high school, where he was continually harassed on account of his sexual orientation. On one occasion, he said, a group of students followed him into an elevator and tried to sexually assault him, later warning him not to report the attack. Todorovic stopped attending school after this incident. When he disclosed his sexual orientation to his parents in January of 1999, his father beat him, threw him out of the house, and declared he would rather Todorovic be dead.

Todorovic testified that his father used personal connections to have his son called into the Serbian army to "make a man out of [him]." AR 91. Todorovic received a conscription letter and reported for duty. As a result of the conflict in Kosovo and the subsequent NATO bombing campaign against Serbia, Todorovic received minimal training; he served as a sentry at a makeshift base located at a former resort outside of Belgrade. Although he did not disclose his sexual orientation to anyone but a physician who initially examined him, Todorovic was

3

harassed from the start, likely, he believed, because one of his high school classmates serving in the same unit had outed him. Todorovic was verbally and sexually abused by other soldiers and at least one commanding officer. While on a night shift, for example, an officer put a gun to his head and ordered him to perform oral sex. Later, he claimed, while most of his unit was off celebrating the end of the NATO bombing campaign, the same officer and another soldier, both intoxicated, found Todorovic alone in his lodgings and took turns forcibly sodomizing him. The men threatened Todorovic and warned him not to report the incident, but Todorovic did so anyway. He was given a discharge letter several weeks later, but was instructed to report periodically to the military for several years. Todorovic was told that the rapists would be imprisoned for a few days for disorderly conduct.

In mid-October 1999, after leaving the army, Todorovic and his then-boyfriend were stopped by the police while walking in a street in Belgrade; the police appeared to know they were gay because Todorovic's boyfriend was a gay rights activist, and the police, Todorovic testified, are known to keep track of gay men. The two were taken to a police station, where one of the officers placed Todorovic in a group cell and told the other prisoners that he had "brought a hooker up here so you can have some fun." AR 120. The inmates chose the "filthiest" prisoner and forced Todorovic to perform oral sex on him. A few hours

later, Todorovic was questioned at length about the gay rights organization to which his boyfriend belonged. Todorovic testified that the police officer began interrogating him by hitting him in the knee with a rubber stick, while stating that "he hates fucking faggots and that . . . he hopes that there are no faggots in Serbia, that we should all die. That we should get all like exterminated." AR 122. The officer then beat Todorovic at intervals before eventually releasing him. When Todorovic returned home, he discovered that his boyfriend's ribs had been broken.

Not long after, Todorovic was in a gay-friendly bar in Belgrade, where at one o'clock in the morning, around twenty men entered the premises, armed with baseball bats, chains, wooden sticks, and knives. Todorovic claimed that they began to destroy the bar and to shout slurs at the gay patrons. Todorovic and others attempted to flee, but another group of armed men was waiting outside the bar. Todorovic was struck in the head with a chain and fell to the ground, where the men outside the bar beat him unconscious with baseball bats. He was eventually taken to a hospital by an ambulance, where he remained for ten days.

When he was able to walk again, Todorovic contacted an agent for a cruise line and applied for a job. He was hired as a snack steward for the MS Regal Empress, and left Serbia to meet the ship in Miami, Florida, on April 20, 2000. A few months later, his boyfriend informed him that a gay pride parade, the first of its kind in Serbia, had been attacked by "hooligans, skinhead[s]," and others, who

5

threw rocks and beat the parade marchers. Upon learning of the incident, Todorovic decided he could not return to Serbia; he later said that he continued to have nightmares about his life there.

Todorovic eventually applied for asylum, and the Department of Homeland Security referred his application to an IJ for asylum-only removal proceedings. Aside from his testimony, Todorovic offered medical records indicating that he had sustained injuries during a "brawl" in January of 2000 -- corresponding to the incident in the bar -- including a fractured jaw, a hematoma on both sides of the thoracic cavity, a left knee sprain, a broken nose, and a fracture of the right collarbone. AR 263-66. He also submitted an "Order to Report for Military Service" instructing him to report to the military on October 17, 2002, apparently one of many letters he continued to receive from the Serbian army following his conditional discharge.

Todorovic also submitted a number of background articles regarding the treatment of homosexuals in Serbia. Some of them referenced the attack on the gay pride parade, and one noted that in the aftermath of the attack, the Serbian Prime Minister and Belgrade's Chief of Police said that Serbia was not ready to tolerate homosexuality. AR 323. Other materials documented threats and violent attacks against gays, including beatings by the police, and harassment by "youth gangs" known as "dizelasi." AR 346-49. A copy of the State Department's Serbia

Country Report on Human Rights Practices for 2006 noted that violence and discrimination against homosexuals was a continuing problem in Serbia, and that gays and lesbians were reported to experience "widespread threats, hate speech, verbal assault, and physical violence." AR 286.

In an oral decision, the IJ denied Todorovic's asylum petition as untimely, and found that Todorovic was not a credible witness. As for credibility, the IJ began this way:

> The Court would first note that the respondent says that he is singled out for persecution because he is gay in his home country. The Court studied the demeanor of this individual very carefully throughout his testimony in Court today, and this gentleman does not appear to be overtly gay. The Court does not know whether he is or not, his testimony is that he is overtly gay and has been since he was 17 years old. Be that as it may, it is not readily apparent to a person who would see this gentleman for the first time that, that is the case, since he bears no effeminate traits or any other trait that would mark him as a homosexual.

AR 28-29. The IJ then explained that the "most serious problem" he had with Todorovic's testimony concerned his experience in the military. AR 29. For one, the IJ said Todorovic's account lacked a sufficiently detailed explanation of how his father was able to have him called into the military. Even more problematic, the IJ found, was Todorovic's claim that the makeshift military base where he was stationed contained anti-aircraft guns, despite his earlier comment that the base was

7

meant to be "secluded and secret," so that it could not be identified by satellites. The IJ found several lesser inconsistencies as well.

Since he did not find Todorovic credible, the IJ concluded that Todorovic had "failed to prove to a preponderance of the evidence that his life or freedom would be threatened if he were returned to his native country." AR 36. The IJ reiterated that "it is clear that this gentleman is not overtly homosexual and there is no reason he would be immediately recognized as such." Id. Thus, the IJ said, "even if the respondent's testimony were taken at face value, . . . the respondent would not qualify in the Court's opinion for withholding because he has failed to meet his burden of proof." Id.

On appeal, the BIA affirmed the IJ's determination that Todorovic's asylum application was untimely. AR 3-4. The Board also "agree[d] with the Immigration Judge that the applicant was not a credible witness." AR 4. In support of that conclusion, it offered one rationale of its own and then highlighted two aspects of the IJ's findings that it considered persuasive. First, the Board explained that while Todorovic claimed to fear returning to Serbia, he had admitted that when he left to work on the cruise ship, he intended eventually to return to Serbia. The Board said that "[s]uch plainly incompatible contentions undermine the subjective sincerity of the applicant's claimed fear of persecution and, by logical extension, the factual bases on which the claim is founded." AR 5. Next, the Board "agree[d] with the

8

Immigration Judge that the applicant's testimony regarding his alleged period of service in Serbia is 'highly suspect.'" Id. (quoting Oral Decision of IJ).  The Board highlighted two examples cited by the IJ, namely, that "[t]he applicant could not satisfactorily detail how he even came to be enlisted in the Serbian military," and that he "provided undetailed and contradictory testimony to the nature of his training and duties while in the Serbian military." Id.  Like the IJ, the Board concluded that the lack of credible testimony precluded relief under the INA or the CAT. Id.

Todorovic timely petitioned this Court for review.

## II.

We review administrative fact findings, including credibility determinations, under the "highly deferential" substantial evidence test. Adefemi v. Ashcroft, 386 F.3d 1022, 1026-27 (11th Cir. 2004) (en banc).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  We "view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision," Adefemi, 386 F.3d at 1027, and we will reverse the agency's findings "only if the evidence 'compels' a reasonable fact finder to find otherwise," Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1230 (11th Cir. 2005) (citations omitted).  Where the BIA issues its own opinion, we

9

review only that opinion, except to the extent that it expressly adopts the immigration judge's reasoning. Chen, 463 F.3d at 1230. If the BIA does so, we review the relevant portions of the IJ's opinion as well. Id.

An applicant may establish eligibility for withholding of removal under the INA by showing that his "life or freedom would be threatened in the proposed country of removal on account of . . . membership in a particular social group." 8 C.F.R. § 208.16(b). The applicant must demonstrate "that it is 'more likely than not' [he] will be persecuted or tortured upon being returned to [his] country." Sepulveda, 401 F.3d at 1232. To establish eligibility for CAT relief, an applicant must show that it is more likely than not that he will be tortured by, or with the acquiescence of, government officials if returned to the designated country of removal. 8 C.F.R. § 208.16(c)(2).

"If an alien's testimony is credible, it may be sufficient, without corroboration, to satisfy [his] burden of proof in establishing [his] eligibility for relief from removal." Tang v. U.S. Att'y Gen., 578 F.3d 1270, 1276 (11th Cir. 2009); see also 8 C.F.R. § 208.16(b). Conversely, a denial of relief can be based entirely on an adverse credibility determination if the applicant fails to provide sufficient corroborating evidence. Tang, 578 F.3d at 1276-77. Credibility determinations made by an IJ must rest on substantial evidence. Id. at 1276, 1278.

III.

10

Todorovic does not contest the agency's determination that his asylum application is time-barred, but argues that its adverse credibility determination is not supported by substantial evidence. He says, first, that the IJ's decision was infected with impermissible stereotypes about homosexuals; second, that there is nothing inconsistent or insincere about his lack of an intent to leave Serbia permanently and his fear of being persecuted if he returns; and third, that there is no inconsistency in his account of his military service.

After thorough review, we conclude that the IJ's decision was so colored by impermissible stereotyping of homosexuals, under the guise of a determination on "demeanor," that we cannot conduct meaningful appellate review of that decision, or of the BIA's opinion essentially adopting it.

In determining an applicant's credibility, an Immigration Judge must consider the totality of the circumstances, including the applicant's demeanor, the inherent plausibility of the applicant's story, and the consistency among the applicant's written and oral statements and other evidence of record. In other words, like any fact-finder, the Immigration Judge will make a determination "on the basis of evidence, which is on the record, interpreted in light of demeanor, which is not." United States v. Shonubi, 895 F. Supp. 460, 480 (E.D.N.Y. 1995), rev'd on other grounds, 103 F.3d 1085 (2d Cir. 1997). The IJ alone is positioned to make determinations about demeanor -- by observing the alien and assessing his

11

or her tone and appearance -- and in that sense is "uniquely qualified to decide whether an alien's testimony has about it the ring of truth." Abdulrahman v. Ashcroft, 330 F.3d 587, 597 (3d Cir. 2003) (citation omitted).

As a consequence, we afford great deference to an IJ's assessment of "demeanor," see Hu v. Holder, 579 F.3d 155, 159 (2d Cir. 2009), which refers to the "carriage, behavior, bearing, manner and appearance of a witness," Dyer v. MacDougall, 201 F.2d 265, 268-69 (2d Cir. 1953). Indeed, evaluating demeanor has long been recognized as a core function of the trier of fact. See, e.g., United States v. Reeves, 730 F.2d 1189, 1195 (8th Cir. 1984) (noting that assessing the "demeanor of the witnesses . . . is peculiarly the province of the fact finder"); Henriod v. Henriod, 89 P.2d 222, 225 (Wash. 1938) ("To watch the attitude and demeanor of a witness testifying at a trial is not only the right but also the duty of the trier of facts."). Credibility determinations, so far as they involve demeanor, have thus been characterized as largely "unreviewable." Hambsch v. Dep't of the Treasury, 796 F.2d 430, 436 (Fed. Cir. 1986); see also N.L.R.B. v. Dinion Coil Co., 201 F.2d 484, 487 (2d Cir. 1952).

At the same time, because of the "immense discretion" conferred on those, such as an IJ, who find facts on the basis of oral testimony and demeanor, Dinion Coil Co., 201 F.2d at 488, we require that credibility determinations made by an IJ rest on substantial evidence, rather than on conjecture or speculation, Tang, 578

12

F.3d at 1276, 1278. One clearly impermissible form of conjecture and speculation, sometimes disguised as a "demeanor" determination, is the use of stereotypes as a substitute for evidence. Indeed, a number of our sister circuits have rejected credibility determinations that rest on stereotypes about how persons belonging to a particular group would act, sound, or appear.

In Razkane v. Holder, 562 F.3d 1283 (10th Cir. 2009), for example, just as in this case, the IJ's credibility determination and findings on the merits were impermissibly influenced by stereotypes about homosexuals. The IJ had explained that the applicant's "appearance does not have anything about it that would designate [him] as being gay. [He] does not dress in an effeminate manner or affect any effeminate mannerisms." Id. at 1286 (alterations in original). As the Tenth Circuit explained,

> [t]he IJ's reliance on his own views of the appearance, dress, and affect of a homosexual led to his conclusion that [the applicant] would not be identified as a homosexual. From that conclusion, the IJ determined [the applicant] had not made a showing it was more likely than not that he would face persecution in [his home country].

Id. at 1288. The appellate court refused to "condone this style of judging, unhinged from the prerequisite of substantial evidence," which, it said, "would inevitably lead to unpredictable, inconsistent, and unreviewable results." Id. The court explained that "[t]he fair adjudication of a claim for restriction on removal is dependent on a system grounded in the requirement of substantial evidence and

13

free from vagaries flowing from notions of the assigned IJ." Id. The IJ's "homosexual stereotyping . . . preclude[d] meaningful review" of the agency decision. Id.

Similarly, in Ali v. Mukasey, 529 F.3d 478 (2d Cir. 2008), the Second Circuit vacated the agency's decision where it too rested, in part, on improper remarks about homosexuals, such as "that no one would perceive [the applicant] as a homosexual unless he had a 'partner or cooperating person.'" Id. at 491. These remarks, untethered to the record, impermissibly "derive[d] from stereotypes about homosexuality and how it is made identifiable to others." Id. at 491-92. And in Shahinaj v. Gonzales, 481 F.3d 1027 (8th Cir. 2007), the Eighth Circuit overturned the agency's credibility determination where it rested in part on "the IJ's personal and improper opinion [that] [the applicant] did not dress or speak like or exhibit the mannerisms of a homosexual." Id. at 1029. The court could not be certain, it said, that the IJ's findings as a whole were not tainted by this obvious bias.

This case presents similar problems, inasmuch as the IJ relied on impermissible stereotypes about gay people as a substitute for substantial evidence. Notably, Todorovic never testified that he was "overtly gay" or that this was the reason for his persecution; rather, the abuses to which he testified were the result of hostility by people who appeared to know he was gay for reasons other than his appearance or behavior. See AR 103, 109-11, 118-19, 123, 127-28. Yet, the very

14

first reason offered by the IJ for his decision was that, although the applicant "says that he is singled out for persecution because he is gay in his home country[,] . . . [t]he Court studied the demeanor of this individual very carefully throughout his testimony in Court today, and this gentleman does not appear to be overtly gay." AR 28-29.  Specifically, the IJ observed that "it is not readily apparent to a person who would see this gentleman for the first time that, that is the case, since he bears no effeminate traits or any other trait that would mark him as a homosexual."  AR 29.  And indeed, toward the end of his oral opinion, the IJ again referenced that the petitioner "is not overly homosexual," and, therefore, that there was no reason to believe he would be "immediately recognized" as gay.  AR 36.

As we see it, this so-called "demeanor" determination rests on wholly speculative assumptions made by the IJ; it is untethered from any evidential foundation; and it is thoroughly vague in its reference to "other trait[s]" that would mark the petitioner as a homosexual.  Whatever else these offensive observations made by the fact-finder were, they were not credibility findings based on demeanor, but instead were driven by stereotypes about how a homosexual is supposed to look.  Cf. Cosa v. Mukasey, 543 F.3d 1066, 1069 (9th Cir. 2008).  The IJ's comments elevated these ungrounded assumptions to demeanor evidence, and the IJ drew adverse inferences about the petitioner's credibility and legal conclusions from them.  See Razkane, 562 F.3d at 1288.  These stereotypes most

15

assuredly are not substantial evidence.  They "would not be tolerated in other

contexts, such as race or religion."  Razkane, 562 F.3d at 1288-89.  See also Cosa,

543 F.3d at 1069 (reversing adverse credibility finding because it "stemmed from

pure speculation about how a [member of the applicant's religion] might look and

act"); Huang v. Gonzales, 403 F.3d 945, 949 (7th Cir. 2005) ("[The IJ's] personal

beliefs or some perceived common knowledge about the religion . . . [are] . . . not a

proper basis for an adverse credibility finding.").  We see no reason to tolerate

them here.

The IJ's reliance on impermissible stereotypes taints his credibility

determination as a whole, and thus prevents us from conducting any fair

assessment of this record.  We recognize that the IJ also determined that there were

inconsistencies in Todorovic's testimony.  But we have no occasion to address, and

do not address, whether any of the purportedly inconsistent testimony would

amount to "substantial evidence" supporting an adverse credibility determination --

in other words, whether the subject testimony is inconsistent enough or material

enough that rejecting the applicant's entire account would be a "reasonable"

decision for an IJ to make, after considering the totality of the circumstances and

the record as a whole.  See Kadia, 501 F.3d at 820-23; see also Moore, 405 F.3d at

1211.  On this record, we simply cannot be sure that the IJ's impermissible

stereotyping of gay men did not animate his adverse credibility determination,

16

especially where the very first reason he offered for disbelieving Todorovic's detailed testimony was that Todorovic did not appear to be overtly gay or effeminate, and where he reiterated that same "finding" in his conclusion. Given the "immense discretion" lodged in an administrative fact-finder like the IJ in making credibility determinations, Dinion Coil Co., 201 F.2d at 488, it is not too much to require that these critical determinations be made without the taint of improper and offensive stereotypes like the one invoked in this case.

The Board's opinion is similarly unreviewable because we cannot tell whether it, too, was tainted by the IJ's improper stereotyping of homosexuals. Almost at the outset of its opinion, the Board tells us unequivocally that it "agree[d] with the Immigration Judge that the applicant was not a credible witness." AR 4. Rather than distancing itself in some obvious and pronounced way from the IJ's so-called "demeanor" determination, the Board appears to have broadly embraced the IJ's credibility determination. The Board highlights, in a single sentence, two examples of supposedly inconsistent testimony cited by the IJ in support of his determination, see AR 5 ("The applicant could not satisfactorily detail how he even came to be enlisted in the Serbian military, and the applicant provided undetailed and contradictory testimony to the nature of his training and duties while in the Serbian military." (record citations omitted)). In fact, the Board has offered precious little analysis that is different from the IJ's reasoning or

17

conclusion. The only other rationale offered by the Board is that Todorovic's intention to return to Serbia at the time he went to work on the cruise ship undermines the sincerity of his claimed fear that he would be persecuted if he returned.

While the Board may well have made its credibility determination for reasons wholly divorced from the impermissible stereotyping that appears to have driven the IJ's determination, again, it is not too much to ask the fact-finder to make its credibility determinations without the stain of this stereotyping, utterly unconnected to any evidence. Quite simply, we cannot tell with any degree of confidence what the basis for the Board's opinion was. As a result, we are precluded from engaging in meaningful appellate review. Accordingly, we vacate the agency's decision and remand for a new factual hearing, free of any impermissible stereotyping or ungrounded assumptions about how gay men are supposed to look or act.

**PETITION GRANTED; VACATED AND REMANDED.**