[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-14300
Non-Argument Calendar
_____

Agency No. A093-440-769


LUIZ CLAUDIO FRANCISCO,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(September 12, 2014)

Before HULL, MARCUS, and FAY, Circuit Judges.

PER CURIAM:

Luiz Claudio Francisco, a native and citizen of Brazil, seeks review of the

Board of Immigration Appeals ("BIA")'s dismissal of his appeal from the

Immigration Judge ("IJ")'s denial of his application for withholding of removal and for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). We deny Francisco's petition for review.

## I. BACKGROUND

A. Background Facts

Francisco testified he began working as a driver for one of the directors of a candidate for the presidency of the Metalworkers Union in Rio de Janeiro in 1998. He was paid only part of his wages and was told he would be completely paid, when the campaign ended. In April 1998, the candidate was elected as union president; Francisco still was not paid his full wages and was told to be patient. During a May 1998 union meeting, Francisco told the Union president he had not yet been paid and, if he was not paid, he would denounce the Union on the radio. The president warned Francisco against following through with his threat and ejected him from the meeting.

Approximately one week later, while he was walking home from a soccer match, three men he did not know called him by name and confronted him about his threat. The men cursed at Francisco, beat him, and kicked him for approximately three or four minutes. As the men left, they told Francisco "this was only a message and . . . next time . . . [his] family would be lighting candles

2

for [him]." ROA at 89. Francisco reported the incident to the police, who did not seem to take him seriously.

In June 1998, he called a radio program and spoke about how the Union had not paid him and had sent men to assault him, when he complained. He identified himself on the radio, and approximately two days later, he began receiving threatening phone calls. Callers cursed at him and said he "had just signed [his] death sentence." ROA at 92. Francisco received approximately 15 calls over the next month or two.

In September 1998, Francisco and his brother opened a store in a small town approximately 200 kilometers from Rio de Janeiro. That December, the store was broken into and most of the merchandise was stolen. An unidentified man later telephoned Francisco and told him, next time, he would not only lose his merchandise, but also would lose his life. Francisco believed this man was associated with the union, because a common thief would not call him and threaten his life. He reported the break-in to police. Approximately three days after the break-in, Francisco moved in with his aunt, where he hid until he left the country. His aunt lived approximately 50 kilometers from the city in which his store had been located. He continued to receive anonymous telephone calls while living with his aunt. Francisco entered the United States on March 1, 1999, with permission to stay until September 1, 1999.

3

B. Course of Proceedings

In September 2011, Francisco was issued a Notice to Appear ("NTA") charging him with removability under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), for being an alien who, having been admitted as a non-immigrant, remained in the United States for a longer time than permitted. Francisco applied for withholding of removal under the Immigration and Nationality Act ("INA") based on political opinion and membership in a particular social group and CAT relief.[1]

During a hearing before an IJ, Francisco admitted the factual allegations in the NTA, conceded removability, and identified his social group as "Brazilians who express a disapproval of union practices." ROA at 109. Francisco testified to the facts above. He could not recall the names of the Union candidate and director for whom he had worked as a driver, although he had worked in that job for 8-20 hours per day, 5-6 days per week, for 2 months. Francisco did, however, identify by name and frequency the radio station on which he had denounced the Union.

Francisco testified he was afraid to return to Brazil, because he feared for his life from the union. He would not be safe anywhere in Brazil, because the union has a presence throughout the country. According to Francisco, the previous Brazilian president had served as president of the steel union in São Paulo, and the

---

[1] Francisco initially also sought asylum, but he has since withdrawn that claim.

4

current Brazilian president previously had worked in the union with the previous Brazilian president.

Francisco testified he had asked his brothers to seek corroborating documents from the police, the radio station, and the union. They had been unsuccessful, because 14 years had passed, and the entities could not find any of the information they requested. One brother had written a letter explaining their efforts and why they had not succeeded, but Francisco had not received it, and he had not asked for another letter.

Francisco could not confirm whether any of the people involved in his prior union incidents were still alive. He explained he did not fear the union members but "the union itself." ROA at 104. But he had not received a threatening phone call since he had lived with his aunt in Brazil. He had not asked his aunt to provide him with a statement.

The parties submitted the 2010 and 2011 U.S. Department of State's Human Rights Reports for Brazil ("Country Reports"). The references to union activities in the Country Reports noted authorities in Brazil at times did not effectively enforce laws protecting union members from discrimination.

The IJ denied Francisco's requests for relief and ordered him to be removed to Brazil. The IJ concluded Francisco's testimony was not credible, because: (1) he could not remember the names of the union members for whom he had

5

worked; (2) his testimony was vague; and (3) he could not identify anyone in the Union, who would want to harm him.  Moreover, Francisco had failed to provide corroborating evidence, as required by the REAL ID Act of 2005.  The IJ alternatively determined Francisco had not established a right to relief on the merits of his claims.

Francisco appealed to the BIA.  The BIA considered Francisco credible for purposes of review and dismissed his appeal for lack of corroboration.  In his petition for review, Francisco argues his testimony sustained his burden of proof, regardless of his inability to obtain corroborating records. [2]

## II. DISCUSSION

Where the BIA issues its own opinion, without expressly adopting the IJ's opinion, but affirms and relies upon the IJ's decision and reasoning, we first review the IJ's opinion, to the extent the BIA found the IJ's reasons were supported by the record.  *Tang v. U.S. Att'y Gen.*, 578 F.3d 1270, 1275 (11th Cir. 2009).  We then review the BIA's decision as to those matters on which it rendered its own opinion and reasoning.  *Id.*  We review factual determinations under the substantial-evidence test.  *Carrizo v. U.S. Att'y Gen.*, 652 F.3d 1326, 1330 (11th Cir. 2011) (per curiam).  Substantial evidence is such relevant evidence as a reasonable

---

[2] Because Francisco has failed to brief any claim he may have had for CAT relief, he has abandoned the issue.  *See Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (per curiam) ("When an appellant fails to offer argument on an issue, that issue is abandoned.").

6

person would accept as adequate to support a conclusion. *Todorovic v. U.S. Att'y Gen.*, 621 F.3d 1318, 1323-24 (11th Cir. 2010). Under this test, we view the record evidence in the light most favorable to the decision and draw all reasonable inferences in favor thereof. *Carrizo*, 652 F.3d at 1330. We will reverse an IJ's factual findings only if the evidence compels a reasonable factfinder to find otherwise. *Id.* at 1331. The mere fact that the record may support a contrary conclusion is not enough to justify a reversal. *Diallo v. U.S. Att'y Gen.*, 596 F.3d 1329, 1332 (11th Cir. 2010) (per curiam).

An alien is entitled to withholding of removal upon a showing that, if returned to his country, his life or freedom would be threatened in that country because of his race, religion, nationality, membership in a particular social group, or political opinion. *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1232 (11th Cir. 2005) (per curiam) (citing INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A)). An alien may make such a showing in two ways. *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1375 (11th Cir. 2006). He may establish past persecution in his country based on a protected ground, or he may show it is more likely than not he will be persecuted on account of a protected ground upon return to his country. 8 C.F.R. § 208.16(b)(1)-(2); *Tan*, 446 F.3d at 1375. Persecution is "an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation." *Sepulveda*, 401 F.3d at 1231 (citation and internal quotation marks omitted).

7

The alien's testimony may be sufficient to sustain his burden without corroboration, but only if the factfinder finds his testimony is credible, is persuasive, and refers to specific facts sufficient to establish a right to relief. *See* INA § 241(b)(3)(C), 8 U.S.C. § 1231(b)(3)(C) (cross-referencing INA § 208(b)(1)(B)(ii), 8 U.S.C. § 1158(b)(1)(B)(ii)); 8 C.F.R. § 208.16(b); *Yang v. U.S. Att'y Gen.*, 418 F.3d 1198, 1201 (11th Cir. 2005). "The weaker an applicant's testimony, however, the greater the need for corroborative evidence." *Yang*, 418 F.3d at 1201. After the passage of the REAL ID Act of 2005, when the IJ determines an alien should provide evidence to corroborate otherwise credible testimony, such evidence must be provided unless the alien shows he does not have the evidence and cannot reasonably obtain it. INA § 208(b)(1)(B)(ii), 8 U.S.C. § 1158(b)(1)(B)(ii). No court may reverse a factfinder's determination as to the availability of corroborating evidence unless the court determines a reasonable factfinder is "compelled to conclude that such corroborating evidence is unavailable." INA § 242(b)(4), 8 U.S.C. § 1252(b)(4).

Assuming, as the BIA did, Francisco's testimony was credible, the record does not compel a finding that his testimony was sufficiently detailed to establish past persecution or a well-founded fear of future persecution without some corroborating evidence. *See Carrizo*, 652 F.3d at 1331; *see also* INA § 208(b)(1)(B)(ii), 8 U.S.C. § 1158(b)(1)(B)(ii). Francisco could not identify by

name the Union officials for whom he had worked, and his testimony contained no facts suggesting any union members involved in his prior, 14-year-old altercations were still active in the union or interested in him. He identified no threats in the 14 years since he left Brazil. The Country Reports, which indicated union members themselves were targets of discrimination, undermined Francisco's vague allegations as to widespread official support of union activities in Brazil.

Francisco's reliance on *Niftaliev v. U.S. Att'y Gen.*, 504 F.3d 1211 (11th Cir. 2007), is misplaced. The petitioner in *Niftaliev* provided extensive and detailed testimony about "protests, beatings, arrests, searches, interrogations, being imprisoned for fifteen days, being held with little food or water, being threatened with being shot and even continued harassment" when he left his home country. *Niftaliev*, 504 F.3d at 1217. We concluded the "cumulative effect" of the petitioner's testimony established past persecution without the need for corroboration. *Id.* Francisco, by contrast, identified a single assault by unknown men, several anonymous telephone threats over a two-to-three month period, and a burglary of his store by unknown individuals, which was followed by another anonymous telephone call. Given the weaknesses in Francisco's testimony, the record does not compel the conclusion that the BIA erred in finding it was insufficient, absent corroboration, to establish his life or freedom would be threatened in Brazil because of a protected ground. *See* INA § 241(b)(3)(A), 8

9

U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16(b); *Carrizo*, 652 F.3d at 1330; *Sepulveda* 401 F.3d at 1231-32.  Nor does the record compel the conclusion that corroborating evidence was unavailable, given Francisco's failures to seek corroboration from his aunt and to follow-up with his brother as to the brother's letter.  *See* INA § 242(b)(4), 8 U.S.C. § 1252(b)(4).

**PETITION DENIED.**