[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-14431
Non-Argument Calendar

_____

Agency No. A075-746-742


LIQIN ZENG,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(September 15, 2014)

Before WILLIAM PRYOR, MARTIN, and FAY, Circuit Judges.

PER CURIAM:

Liqin Zeng, a native and citizen of China, seeks review of the Board of

Immigration Appeals's ("BIA") dismissal of her appeal from the Immigration

Judge ("IJ")'s denial of her application for asylum and withholding of removal under the Immigration and Nationality Act ("INA") and under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").  We deny Zeng's petition for review.

## I.  BACKGROUND

A.  2007 Asylum Application; 2008 Notice to Appear

In December 2007, Zeng filed a counseled application for asylum, withholding of removal based on political opinion, and CAT relief.  Zeng asserted in her application that she left China on August 10, 2001 and entered the United States on August 12, 2001, on a K-1 non-immigrant visa.[1]

As an attachment to her 2007 application, Zeng submitted a personal statement, in which she alleged she feared persecution if she returned to China, because she had violated China's family-planning laws.  According to Zeng, when she first entered the United States, lawyers told her she was not eligible for asylum, because she was single.  She later married, and she was pregnant with her third child at the time of her 2007 application.  Zeng alleged that, if she was returned to China, her husband and children would accompany her, and she or her husband would be sterilized.

---

[1] "A K-1 nonimmigrant visa, known colloquially as a 'fiancé visa,' permits the foreign-citizen fiancé of an American citizen to travel to the United States to marry his or her citizen sponsor within ninety days of arrival."  *Chen v. Holder*, 742 F.3d 171, 174 (4th Cir. 2014); *see also* INA § 101(a)(15)(K)(i); 8 U.S.C. § 1101(a)(15)(K)(i).

According to notes from a January 2008 interview with an asylum officer, Zeng answered "[f]amily planning" when asked why she came to the United States. A.R. at 298. Zeng similarly said in her interview she was applying for asylum because of China's family-planning policy. Zeng told the asylum officer she would be fined and sterilized if she returned to China. When asked whether anything else made her more afraid of returning to China than she previously had been, Zeng did not identify any other grounds. When asked whether she had anything to add, Zeng responded that she did not. An attachment to Zeng's asylum interview notes indicated that Zeng's native language was "Fuzhounese" and that she had been interviewed via an English-Mandarin interpreter.[2] A.R. at 301.

In February 2008, Zeng was issued a Notice to Appear ("NTA") charging her with removability under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), for being an alien who had been admitted as a non-immigrant and remained in the United States for a longer time than permitted. During an April 2008 hearing before an IJ, Zeng, through counsel, admitted the factual allegations in the NTA, conceded removability, and identified Mandarin as her best language.

B. 2011 Amended Asylum Application

In March 2011, Zeng submitted a counseled, amended application for (1) asylum; (2) withholding of removal based on religion, political opinion, and

---

[2] Mandarin and Fuzhounese (Foo Chow) are different dialects of the Chinese language.

membership in a particular social group; and (3) CAT relief. She also submitted an amended personal statement, in which she alleged she and fellow Catholics in her village had held religious services at night, to avoid government detection. According to her amended personal statement, in late 1998, government officials raided the worshipers' secret meeting place, although the priest and nuns were able to escape. The officials burned Zeng's wrists with a cooking utensil and recorded her name and address, because Zeng refused to divulge the whereabouts of the escaped leaders.

Zeng alleged that church raids continued in 1999, and many church followers were detained, injured, and jailed. She decided to flee China to avoid religious persecution. A fellow church member introduced Zeng to a Chinese-American, who arranged for Zeng to travel to the United States.

Once she reached the United States, Zeng consulted with attorneys about seeking asylum, but was told she could not do so because of her K-1 visa. After Zeng married and had her second child, she again consulted with attorneys, who told her she could apply for political asylum if she had two children. Although Zeng told the attorneys about her religious persecution, they told her this issue would complicate her case, and she followed their advice to exclude it.

C.  March 2011 Hearing

A Mandarin interpreter was used during Zeng's asylum hearing in March 2011.  Zeng had filed the amended asylum application to add information omitted from her first application.  According to Zeng's counsel, information had been omitted because (1) the personal statement attached to Zeng's prior application had not been read back to her before she signed it and (2) her prior attorneys had told her to include only her family-planning-policy claims, not her religious claims.

Zeng testified she currently resided in Florida and was a practicing Catholic.  She left China and entered the United States on August 10, 2001, on a K-1 visa.  She later had married, although she did not marry her fiancé sponsor, because he would not join the Catholic Church.  Zeng was seeking asylum because she learned from a friend she could do so once she was pregnant with her third child.  Zeng and her husband had three children who were born in New York.

According to Zeng, the Chinese government had persecuted her on account of her religious beliefs.  She did not apply for asylum when she first arrived in the United States, because multiple law firms told her she was ineligible to do so, due to her K-1 visa.  In 2007, Zeng spoke with "Ms. Lu," of the Yerman law firm, who told her she could apply for asylum based on China's family-planning policies.  A.R. at 187.  Zeng said she told Lu about her religious persecution in China, but was told to exclude it from her application, because it would complicate her case.

Zeng testified that, during her upbringing, her father, mother, grandmother, and uncle all had been arrested because of their religious beliefs. Zeng's mother, who still was in China, had sent Zeng letters indicating her family members could not practice their religion freely and openly. Since leaving China, Zeng had sent various religious materials to underground-church priests in China. She had stopped in December 2010, however, after receiving a letter from her parents stating officials had threatened to arrest her parents if she continued to send materials.

Zeng further testified problems with Chinese officials began in 1998, when police raided an underground church, seeking to arrest the priest and nuns. Zeng was working in the kitchen at the time. She and others tried to protect the priest and nuns. The officers asked for the priest's and nuns' addresses and burned Zeng's right forearm with a hot kitchen implement. Zeng was not arrested at that time, although the officers took her name and address.

When the IJ asked whether anyone had been arrested, Zeng responded: "Yes, the priest and the nuns." A.R. at 193. But during cross-examination later in the hearing, Zeng testified that, on the day her arm had been burned, the priest and nuns had escaped. Zeng subsequently testified two raids occurred—the priest and nuns had been arrested in November 1998, when Zeng had been burned, but had escaped during a later raid.

Zeng testified she belonged to two churches in New York. Since leaving New York, Zeng had tried attending a Catholic church in Florida, but she could not understand the English services. Instead, she traveled from Florida to New York for church by bus once every four to six weeks. If Zeng returned to China, she would continue to practice her religion in an underground church.

During the hearing, a discussion regarding Zeng's fluency in Mandarin arose. Zeng identified Foo Chow (Fuzhounese) as her best language. The government presented Zeng with the translation affidavit attached to her 2007 personal statement, which stated: "[T]he above statement has been read back to me through a competent English-Chinese interpreter sentence-by-sentence and word-by-word." A.R. at 1100. Zeng testified she could read the affidavit, which was in Mandarin, however, after she had signed the affidavit, her former attorney, Lu, took it from her before she had a chance to read it.

As to her fluency, Zeng explained she previously had identified Mandarin as her best language because an attorney told her a Foo Chow interpreter would be difficult to find. She testified she could communicate adequately in Mandarin, but could express herself better in Foo Chow. Consequently, the IJ adjourned Zeng's hearing to obtain a new interpreter.

D.  April 2011 Hearing

The hearing continued in April 2011, after a Foo Chow interpreter was procured.  Although the IJ gave her the opportunity to revisit her prior testimony with the new interpreter, Zeng declined.

During the government's continued cross-examination, Zeng testified she could not remember whether she had entered the United States on August 10 or 11, 2001.  When asked why her 2007 personal statement listed August 12 as her date of entry, Zeng responded she told her lawyer she entered the country on August 10 or 11, but her statement had not been read back to her.  Zeng likewise told her current attorneys she entered the country on August 10 or 11, although they also had mistakenly listed August 12 on her amended statement.

Zeng identified several photographs of her, her family members, and her pastor, each of which was date-stamped August 11, 2001.  Zeng testified the photographs were taken in China on that date.  The IJ admitted into evidence Zeng's Form I-94 Arrival Record, which stated Zeng entered the United States on August 12, 2001.  When presented with this document, Zeng testified she may have been mistaken about her date of entry.

Zeng further testified she began seeking an attorney to apply for asylum in 2001, although she could not recall the names of any law firms she contacted at that time.  Zeng's first child was born in 2003, and her second child was born in

8

2005.  Zeng knew, in 2005, that if she returned to China after having her second child, she would have been forcibly sterilized.  Zeng did not seek asylum in 2005, because she did not know she could be eligible.

Zeng testified she did not mention religious persecution during her 2008 asylum interview, because she was not asked about it, as the application she filed through the Yerman law firm addressed only family-planning issues.  Zeng explained to the IJ that the asylum officer had not asked whether she came to the United States because of family-planning issues; rather, the officer only asked Zeng to explain the birth-control policies in China.  Zeng also told the IJ she did not come to the United States because of China's family-planning policy.

Zeng further testified she moved from New York to Florida in 2008, when a neighbor with a restaurant, "Mr. Wong," asked her to travel to Florida to work as a waitress.  A.R. at 256.  Zeng's husband and children, the youngest of whom was less than one year old at the time, stayed in New York.  Zeng testified that, since arriving in Florida, she had lived in a home she rented with three or four others in Ruskin.  According to Zeng, the home had two bedrooms and one bathroom, and she lived on the second floor.

The IJ admitted into evidence a document from the county property appraiser's website indicating that Zeng's home had one floor, four bedrooms, and two bathrooms.  When confronted with this discrepancy, Zeng testified she did not

venture into rooms other than those she used.  Moreover, Wong rented two homes, and Zeng periodically stayed in both.  Wong had told her to use the address she provided to the IJ, because it was easier to remember.

Zeng then testified she recently had moved to Orlando.  When asked why she had not disclosed this information previously, Zeng responded she could only remember her prior address.  Zeng also told the IJ she had flown from New York to Orlando for her prior hearing and for the current hearing.  When the IJ asked Zeng why she had flown instead of taking the bus, as she previously had testified, Zeng explained she brought an older witness to her earlier hearing who could not travel by bus.

### E.   Decision of IJ

The IJ denied Zeng's requests for asylum, withholding of removal, and CAT relief, and ordered her to be removed to China.  In his oral decision, the IJ catalogued the various documents submitted by both parties.  The IJ concluded the birth of Zeng's second child in 2005 qualified as a changed circumstance that could excuse her from the one-year asylum filing deadline.  But Zeng failed to show she filed her application within a reasonable period of time, as she waited more than two years after the child's birth to do so.  Zeng also had not established any other changed or extraordinary circumstances excusing the late filing.  Consequently, the IJ denied Zeng's request for asylum as time-barred.

The IJ alternatively concluded Zeng's application, even if timely, would be denied based on her lack of credibility. The IJ determined Zeng's testimony diverged significantly from the answers given in her asylum application and interview, and her corroborating evidence was unconvincing. First, Zeng's alleged difficulty in communicating in Mandarin called into question her credibility, in light of her prior, repeated, representations as to her fluency in Mandarin. The IJ found Zeng's "feigned difficulty" with Mandarin was an attempt to excuse her failure to have timely raised her religious-persecution claims. A.R. at 130–31.

Second, the IJ found Zeng's divergent answers as to her date of entry— which were inconsistent with her corroborating evidence—similarly called into question her credibility. Third, Zeng testified inconsistently as to whether the nuns and priest had escaped during the November 1998 church raid. Fourth, as discussed above, Zeng failed to raise timely her religious-persecution claim, which she did not mention during her asylum interview, despite being asked several open-ended questions about her reasons for seeking asylum. The inconsistent reasons given by Zeng for coming to the United States—religious persecution, family planning, or both—likewise called into question her credibility.

Fifth, the IJ found Zeng's testimony as to her residence was incredible. In particular, it was implausible that Zeng: (1) moved to Florida without her family to work as a waitress; (2) traveled from Florida to New York by bus for church

11

monthly; and (3) did not know the number of floors and rooms in her home. Zeng's testimony that she had recently moved to Orlando was inconsistent with her prior testimony in the same hearing that she lived in Ruskin. It also was inconsistent with her testimony that she flew from New York to Florida before each hearing. The conflicting testimony called into question whether she ever had lived in Florida.

Finally, the IJ found Zeng's demeanor supported an adverse-credibility determination. The IJ noted that Zeng laid her head on the witness table when it became clear she did not know details about her home. The IJ specifically found this action as "indicating that her false testimony had been discovered and that she could not clear up the numerous inconsistencies in her record." A.R. at 137.

The IJ alternatively determined Zeng had failed to show past persecution or a well-founded fear of future persecution, and, in any event, she was not entitled to relief as a matter of discretion. Because Zeng had not shown she was eligible for asylum, she also had not established eligibility for withholding of removal. Finally, as to CAT relief, Zeng had not shown she would be subject to torture by, or with the acquiescence of, the Chinese government or a public official, if she returned to China.

F.   BIA Appeal

The BIA dismissed Zeng's subsequent appeal.  The BIA agreed with the IJ's conclusions that Zeng's asylum application was untimely and that she failed to establish eligibility for withholding of removal and CAT relief.  The BIA discussed at length the IJ's findings as to Zeng's credibility and concluded the IJ cited specific, cogent reasons to support the adverse-credibility determination.  Because the BIA found the adverse-credibility determination was not clearly erroneous, it was unnecessary to address the IJ's alternative determinations as to the merits of Zeng's claims.

## II.  DISCUSSION

In her petition for review, Zeng challenges several of the grounds underlying the adverse-credibility determination.  Zeng alternatively argues that, regardless of her credibility as to past persecution, she established a well-founded fear of future persecution based on her Catholic faith and China's family-planning policy.  She also asserts her credible testimony was sufficient to show her eligibility for CAT relief.

"When the BIA issues a decision, we review only that decision, except to the extent the BIA expressly adopts the IJ's decision." *Lopez v. U.S. Att'y Gen.*, 504 F.3d 1341, 1344 (11th Cir. 2007).  Where a petitioner seeks review of an issue not ruled upon by the BIA, we will deny the petition. *See id.*  "We review . . . factual

13

determinations under the substantial-evidence test." *Carrizo v. U.S. Att'y Gen.*, 652 F.3d 1326, 1330 (11th Cir. 2011) (per curiam). "Substantial evidence is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Todorovic v. U.S. Att'y Gen.*, 621 F.3d 1318, 1323–24 (11th Cir. 2010) (internal quotation marks omitted). "Under this test, we view the record evidence in the light most favorable to the decision and draw all reasonable inferences in favor" thereof. *Carrizo*, 652 F.3d at 1330 (alteration and internal quotation marks omitted). We will reverse an IJ's factual findings only if the evidence compels a reasonable factfinder to find otherwise. *Id.* at 1331. "[T]he mere fact that the record may support a contrary conclusion is not enough to justify a reversal . . . ." *Diallo v. U.S. Att'y Gen.*, 596 F.3d 1329, 1332 (11th Cir. 2010) (internal quotation marks omitted).

A credibility determination is a factual finding reviewed under the substantial-evidence test. *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1255 (11th Cir. 2006) (per curiam). A denial of relief can be based entirely on an adverse-credibility determination if the alien fails to provide sufficient corroborating evidence. *Todorovic*, 621 F.3d at 1324. If an applicant produces evidence beyond her own testimony, however, the IJ may not rely solely on an adverse-credibility determination. *Ruiz*, 440 F.3d at 1255. Once an adverse-credibility finding is made, the burden is on the alien "to show the IJ's credibility decision was not

14

supported by specific, cogent reasons[,] or was not based on substantial evidence." *Id.* (alteration in original) (internal quotation marks omitted).

"Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments." *Id.* An IJ, who can observe an alien's tone and appearance, is "uniquely qualified to decide whether an alien's testimony has about it the ring of truth." *Todorovic*, 621 F.3d at 1324 (internal quotation marks omitted). "We afford great deference to an IJ's assessment of demeanor." *Id.* at 1325 (internal quotation marks omitted). "A credibility determination, like any fact finding, may not be overturned unless the record compels it." *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005) (internal quotation marks omitted).

As the BIA properly concluded, the IJ cited specific, cogent reasons to support the adverse-credibility determination. *See Ruiz*, 440 F.3d at 1255. The IJ discussed at length the numerous inconsistencies in Zeng's testimony and asylum application, reasonably found several of Zeng's assertions implausible, and expressly relied on Zeng's demeanor during her hearing. In particular, the IJ relied on (1) discrepancies in Zeng's requests to proceed in Mandarin and Foo Chow; (2) Zeng's inconsistent assertions as to her date of entry; (3) inconsistencies in Zeng's account of the November 1998 church raid; (4) Zeng's failure to raise her religious-persecution claim for many years; (5) Zeng's inconsistent accounts of the

15

reasons she came to the United States; (6) the conflicting accounts of her residence in Florida; (7) the implausibility of Zeng's lack of knowledge as to the number of floors and rooms in her home; and (8) the implausibility of Zeng's assertions that she moved to Florida without her family to work as a waitress and traveled to New York by bus for church.  Although several of the reasons given for the IJ's adverse-credibility determination may be susceptible to more than one interpretation, the record does not compel a different conclusion, particularly in light of the IJ's reliance on Zeng's demeanor.  *See Todorovic*, 621 F.3d at 1324; *Diallo*, 596 F.3d at 1332; *Forgue*, 401 F.3d at 1287.

Zeng also has not shown the IJ and BIA inadequately considered her corroborating evidence.  The IJ and BIA specifically discussed various documents submitted by Zeng.  Both concluded Zeng's personal statements and photographs taken in China were inconsistent with her various accounts as to her date of entry. Zeng has identified no other corroborating evidence that may have changed the outcome of her case.  Thus, she has not met her burden of showing the agency's adverse-credibility determination was not supported by substantial evidence.  *Ruiz*, 440 F.3d at 1255.[3]

**PETITION DENIED.**

---

[3] Zeng's arguments on the merits of her claims are not properly before us, because the BIA did not address the IJ's alternative determinations on those issues.  *See Lopez*, 504 F.3d at 1344 (denying review of issues not ruled on by the BIA).

16