[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 11, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-12212

_____

Agency No. A95-710-226

LIN LIN TANG,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(August 11, 2009)

Before WILSON, KRAVITCH and ANDERSON, Circuit Judges.

WILSON, Circuit Judge:

Lin Lin Tang, a native and citizen of China, petitions for review of the Board of Immigration Appeals' ("BIA") order dismissing her appeal of the Immigration Judge's ("IJ") denial of her applications for asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"). 8 U.S.C. §§ 1158, 1231; 8 C.F.R. § 208.16.

## I. BACKGROUND

Tang seeks protection in the United States because she claims that she has suffered persecution by the Chinese government on account of her religious beliefs, specifically on account of her participation in an unauthorized Christian house church. She fears future persecution should she return to China.

Tang was born in 1985. Her father is a transportation worker, and her mother is a director of a government family planning office. She grew up attending a government-sponsored Catholic church with her grandmother, but she left because she did not like the church. While in high school, she was introduced to an underground family church by a friend and believes that she became a Christian at that time.

The underground church met at her pastor's home, where the church members studied the Bible, sang, gave testimonies, and prayed. On December 24, 2004, she was at church when seven or eight police officers arrived, arrested her

along with other church members, and took them to the police station. The police accused them of belonging to a cult and beat them with fists and batons. Tang was detained for more than 10 days, during which time she was regularly taken into a small room for interrogation and beaten. The officers instructed Tang to sign a letter of confession stating that there was no God, but only the Chinese Communist Party; she refused. Tang was finally released when her parents paid the police 5,000 RMB[1] as bond and 10,000 RMB as a guarantee that she would not participate in her religious activities.

Tang was required to report to the police station every Friday at 2:00 p.m. The police arrested her again in January, February, March, and twice in April 2005, on suspicion that she continued to belong to a family church. Each time she was arrested, she was beaten. When she was arrested in February, she was held for over a week, and when she was released, her parents had to take her to the hospital to be treated for her injuries. She was severely beaten in March when she argued with the police at the station.

---

[1]The renminbi yuan ("RMB") is the currency of China. U.S. Central Intelligence Agency, *The World Factbook: China* (May 27, 2009), *available at* https://www.cia.gov/library/publications/the-world-factbook/geos/CH.html.

Her medical records confirm that, in January 2005, Tang was bruised from beatings "in the back, hand, and feet."[2] She had "multiple bruises" and was "cut on [her] right wrist." Tang's medical records further report that, in March 2005, she was "beate[n] by someone," resulting in "[b]ack, chest, and foot pain with multiple bruises." Additionally, she suffered "three serious internal injuries in the back," as well as "two at the chest." Furthermore, her medical records report that she suffered "[o]ral bleeding," along with "[b]ruises on [the] right side of [her] face." As a further consequence of police brutality, Tang's medical records report that she suffered from "[v]aginal bleeding." Finally, the records state that she was treated for seven days.

Tang was so distraught from this persecution that she could no longer attend school. By the end of April 2005, Tang's mother and grandmother believed she could no longer remain in China and arranged for her to leave. Her grandmother provided her with a French passport and instructed her to leave her Chinese documentation at home. Tang alleges that she did not know that the French passport she carried was illegally altered until she was so informed by authorities in the United States. She traveled first to Japan, where she remained for a week, but did not stay because "America has more freedom," and her grandmother had

---

[2]     As discussed below, contrary to the BIA's statement, the medical records were introduced into evidence in a timely manner, as part of Exhibit 4.

4

arranged for her to go to the United States. While she was in Japan, she called her family, who told her that when she did not show up at the police station as scheduled, the police came to their home and beat up her parents. She then traveled on to the United States.

In her airport interview, when asked the purpose of her travel to the United States, Tang responded that she was Christian and that there were "no rights [and] no [f]reedom" in China and that the "government must approve what church you can go to." When asked to which church she belonged, she replied, "It's just family style." When asked the name of the church, she replied, "Never went to church, just go to people's houses." In her credible fear interview, she testified about her underground church, multiple arrests and beatings, and that there was nowhere else in China where she could live and be safe.

While in the United States, Tang has been living with her aunt and uncle in Andalusia, Alabama. She regularly attends the First Baptist Church in Andalusia and has spoken with the pastor about her religious persecution.

None of Tang's friends or relatives testified at her hearing before the IJ, either because they were busy or had to work. The IJ issued an oral decision in which he determined that Tang did not establish eligibility for asylum because she was not credible based on inconsistencies in her testimony as well as her demeanor. The IJ, after refusing to consider untimely filed documents, found that

Tang had failed to present probative corroborating evidence. The IJ found that Tang's responses seemed "well-rehearsed," primarily because she stated, more than once, that she was detained by the Chinese police for "more than 10 days" and because she was unable to answer questions when posed in different ways. The IJ concluded that it was implausible that her mother, a "ranking member of the government of China," would either pay "bribes" to get Tang out of prison or help Tang leave China illegally, or that the daughter of a government official "would be jailed and beaten for merely being a member of a house church." The IJ noted that Tang had not mentioned her longtime, regular Catholic church attendance in either her airport interview or her credible fear interview. The IJ found it significant that she did not mention her detentions and beatings by Chinese authorities at her airport interview. Tang appealed to the BIA, on the grounds that the IJ should have accepted her documentary submissions and should not have ruled her incredible. The BIA held that Tang's documentary submissions were untimely and that Tang was incredible. Tang then petitioned this court for review, asserting the same two grounds for appeal.[3]

---

[3] Ordinarily, we can affirm on any grounds supported by the record. *See, e.g., American United Life Ins. v. Martinez*, 480 F.3d 1043, 1059 (11th Cir. 2007). However, in this case, because the Government has not expressly asked us to rely on the IJ's alternative holding denying Tang asylum in his discretion, and because the BIA has not expressed any opinion on this alternative holding, we decline to comment on this holding. This does not, however, preclude the BIA from considering it on remand.

"[Where], as here, the BIA issues its own opinion, we review only the decision of the BIA, except to the extent that the BIA expressly adopts the IJ's decision." *Rodriguez Morales v. U.S. Att'y Gen.*, 488 F.3d 884, 890 (11th Cir. 2007) (per curiam). Here, the BIA issued its own opinion, without expressly adopting the IJ's opinion, but affirmed and relied upon the IJ's decision and reasoning. Therefore, we first review the IJ's opinion, to the extent that the BIA found that the IJ's reasons were supported by the record. We then review the BIA's decision, with regard to those matters on which it rendered its own opinion and reasoning.

## II. DISCUSSION

### A. Due Process

Tang first argues that the IJ denied her due process right to a full and fair hearing by not exercising his discretion to admit her untimely-filed supporting documents and that the BIA erred in affirming the IJ's decision. We have "jurisdiction to review substantial constitutional claims raised in the immigration context." *Haswanee v. U.S. Att'y Gen.*, 471 F.3d 1212, 1218 (11th Cir. 2006) (per curiam).

"Due process requires that aliens be given notice and an opportunity to be heard in their removal proceedings." *Fernandez-Bernal v. Att'y Gen. of the United States*, 257 F.3d 1304, 1310 n.8 (11th Cir. 2001). "To establish due process

violations in removal proceedings, aliens must show that they were deprived of liberty without due process of law, and that the asserted errors caused them substantial prejudice." *Lonyem v. U.S. Att'y Gen.*, 352 F.3d 1338, 1341-42 (11th Cir. 2003) (per curiam). However, "the failure to receive relief that is purely discretionary in nature does not amount to a deprivation of a liberty interest." *Scheerer v. U.S. Att'y Gen.*, 513 F.3d 1244, 1253 (11th Cir. 2008) (internal quotation marks and citation omitted).

Here, Tang sought to have admitted into evidence several statements from her family and friends after the filing date set by the IJ. The record demonstrates that Tang was notified in February 2006, when she filed her asylum application, that she was to file all of her supporting documents by September 1, 2006 for a September 18, 2006 hearing. Her hearing was eventually reset for November 13, 2006. According to local rules, Tang was to file her supporting documents at least 22 days before her hearing. She had over seven months to file her documents, and she did file several documents in August 2006.[4] Tang has not shown good cause for missing the deadline.

---

[4] Tang's attorney moved for a continuance (see page 346 of the record) on October 27, 2006, and the IJ denied it on November 3, 2006 (see page 359) stating: "If counsel accepts representation on a scheduled case counsel must be prepared to go forward on the scheduled date."

We conclude that the IJ's decision to exclude evidence offered for submission after a court-ordered filing deadline is discretionary. The governing regulations provide the IJ with administrative control over the removal hearing. 8 C.F.R. § 1003.31(c). The IJ "may set and extend time limits for the filing of applications and related documents and responses thereto, if any. If an application or document is not filed within the time set by the [IJ], the opportunity to file that application or document shall be deemed waived." *Id.* Tang does not have a constitutionally protected liberty interest in the admission of evidence after the court-ordered deadline; thus, she cannot establish a due process violation based on the IJ's adverse decision. Accordingly, Tang's petition is denied as to her due process claim.

**B.    Credibility Finding**

Tang also argues that the IJ's and BIA's adverse credibility findings were not supported by specific, cogent reasons or by substantial evidence. She argues that the record compels a reversal.

**i.    Standard of Review**

Factual determinations, including credibility determinations, are reviewed under a substantial evidence standard, which provides that the decision "can be reversed only if evidence 'compels' a reasonable fact finder to find otherwise."

*Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1230 (11th Cir. 2005) (per curiam); *see also D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 818 (11th Cir. 2004) ("Credibility determinations likewise are reviewed under the substantial evidence test."). This test requires us to "view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Adefemi v. Ashcroft*, 386 F.3d 1022, 1029 (11th Cir. 2004) (en banc). We must affirm the agency's decision "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *D-Muhumed*, 388 F.3d at 818 (internal quotation marks and citation omitted). "To reverse the IJ's fact findings, we must find that the record not only supports reversal, but compels it." *Mendoza v. U.S. Att'y Gen.*, 327 F.3d 1283, 1287 (11th Cir. 2003).

In order to establish eligibility for asylum, an applicant must provide evidence in the record that is "credible, direct, and specific." *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005) (quotation omitted). If an alien's testimony is credible, it may be sufficient, without corroboration, to satisfy her burden of proof in establishing her eligibility for relief from removal. *Id.*; 8 C.F.R. § 208.13(a). Likewise, a denial of asylum relief can be supported solely by an adverse credibility determination, especially if the alien fails to produce corroborating evidence. *Forgue*, 401 F.3d at 1287. If the court explicitly

10

determines that the alien lacks credibility, the court "must offer specific, cogent reasons" for the finding. *Id.* The burden then shifts to the alien to show that the credibility decision was not supported by "specific, cogent reasons" or was not based on substantial evidence. *Id.*

In the REAL ID Act of 2005, Congress amended the law regarding credibility determinations for applications for asylum and withholding of removal filed after May 11, 2005. *See* Pub. L. No. 109-13 § 101, 119 Stat. 302. As 8 U.S.C. § 1158(b)(1)(B)(iii) now reads:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor. There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.

Tang's application, which was filed in February 2006, is governed by the REAL ID Act, whose provisions apply to applications for asylum filed on or after May 11, 2005.

11

An alien applying for asylum must show that she is a refugee. 8 C.F.R. § 208.13(a). An alien qualifies as a refugee if she can establish that she has suffered past persecution or has a well-founded fear of future persecution, based on a protected ground, in her country of origin. 8 C.F.R. § 208.13(b)(1) and (2). The five protected grounds are "race, religion, nationality, membership in a particular social group, or political opinion. . . ." 8 U.S.C. § 1158(b)(1)(B)(i). In order to be well-founded, an applicant's fear of persecution must be "subjectively genuine and objectively reasonable." *De Santamaria v. U.S. Att'y Gen.*, 525 F.3d 999, 1011 (11th Cir. 2008) (quotation omitted).

An alien seeking withholding of removal must show that her "life or freedom would be threatened . . . because of the alien's race, religion, nationality, membership in a particular social group, or political opinion" if she returned to the country in question. 8 U.S.C. § 1231(b)(3)(A). To do so, she must demonstrate that she "more-likely-than-not would be persecuted or tortured upon h[er] return to the country in question." *Mendoza*, 327 F.3d at 1287.

If an alien establishes past persecution in her country based on a protected ground, it is presumed that her life or freedom would be threatened upon return to her country unless the government shows by a preponderance of the evidence that (1) the country's conditions have changed so that the applicant's life or freedom would no longer be threatened upon her removal; or (2) the alien could avoid a

12

future threat to her life or freedom by relocating to another part of her country, and it would be reasonable to expect her to do so. 8 C.F.R. § 208.16(b)(1)(i); *Mendoza*, 327 F.3d at 1287.

## ii. Perceived Inconsistences in Tang's Testimony

We agree with the BIA's conclusion that the IJ erred in (1) relying on letters from Tang's family and friends to discount Tang's testimony, despite his refusal to admit those letters into evidence; and, (2) misstating a significant portion of Tang's testimony as to the number of times she had been detained and beaten.[5] To the extent that these errors led the IJ to find inconsistencies in Tang's testimony and to eventually find her incredible, we agree with the BIA that such purported inconsistencies need not be credited.

However, we also disagree with two additional grounds on which the IJ based his adverse credibility finding. The IJ concluded that Tang was incredible because (a) he did not believe that her mother would have paid bribes to get her out of jail or would have helped her leave China illegally because her mother worked for a government family planning office; and (b) the IJ concluded that her responses as to whether she was "Christian" prior to joining the family church were inconsistent. Although the BIA indicated its approval of these purported

---

[5]In particular, the asserted inconsistency that we will not credit is Tang's and her parents' characterization of her December 2004 detention as lasting for "over 10 days."

inconsistencies, we conclude that the record compels us to find that Tang's testimony in these regards was wholly consistent.

First, there was no evidence that Tang's mother was a high ranking member of the Chinese government who could protect her from police brutality. The IJ's statements to that effect were invented out of whole cloth. Furthermore, the IJ's supposition that Tang's mother would not have violated Chinese law in order to protect her daughter are not only without support in the record, but are contrary to common sense. It is appropriate for us to reverse when a credibility determination is based solely on speculation and conjecture, and the IJ's conclusion that Tang's mother would not "flagrantly" violate Chinese law to help her daughter flee amounts to little more than speculation. *See Ramsameachire v. Ashcroft*, 357 F.3d 169, 178 (2d Cir. 2004) ("[W]e will reverse where the adverse credibility determination is based upon speculation. . . ."); *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002) ("Adverse credibility determinations based on speculation or conjecture, rather than on evidence in the record, are reversible."); *Salaam v. INS*, 229 F.3d 1234, 1238 (9th Cir. 2000) (per curiam) ("This Court reverses an adverse credibility determination that is based on 'speculation and conjecture' and is not supported by evidence in the record.") . To the extent that the IJ based his adverse credibility determination on his personal perceptions about the reasonableness of

14

Tang's mother's actions, his determination is not supported by *any evidence*– let alone by substantial evidence due deference.

Second, the IJ found inconsistencies between Tang's testimony at her airport interview and her testimony at her credible fear interview and asylum hearing with regard to her early Christian experience. The IJ concluded that Tang was inconsistent because she did not mention her Catholic-church attendance during her airport interview. In contrast, we find that her testimony on this point was wholly consistent.

The REAL ID Act provides that the IJ may rely on "the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made). . . ." 8 U.S.C. § 1158(b)(1)(B)(iii). We conclude that when an IJ "consider[s] the circumstances" of an airport interview, the IJ should keep in mind that an airport interview is not an application for asylum. An IJ may of course consider whether there are contradictions between the airport interview and later testimony. However, when considering whether later testimony qualifies as a contradiction, as opposed to an elaboration, of an applicant's airport interview statements, an IJ should note that during an airport interview, unlike in a hearing with full due process accorded, the alien is not represented by counsel and may be markedly intimidated by official questioning, particularly if the alien has indeed

15

been subject to government abuse in her country of origin.  *See Balasubramanrim v. INS*, 143 F.3d 157, 163 (3d Cir. 1998) (explaining that "an arriving alien who has suffered abuse during interrogation sessions by government officials in his home country may be reluctant to reveal such information during the first meeting with government officials in this country").  *See also Ramsameachire*, 357 F.3d at 180 (finding that an interview can be less reliable if it appears that the alien is reluctant to reveal information due to coercive experiences in her or her country of origin); *Balogun v. Ashcroft*, 374 F.3d 492, 504 (7th Cir. 2004) (noting that "if there are language barriers or if the applicant has a reasonable fear of governmental authority (perhaps because the applicant recently has been subjected to governmental abuse or coercion), then evasive answers on the question of fear of persecution would not be a reliable indicator of a true lack of fear").  Thus, if an alien's statements during an airport interview are less detailed than the alien's later testimony, the IJ should not focus exclusively on airport interview omissions, rather than contradictions, when determining whether the alien is credible.

The Seventh Circuit has concluded that "airport interviews are not always reliable indicators of credibility" subsequent to the passage of the REAL ID Act. *Moab v. Gonzales*, 500 F.3d 656, 660 (7th Cir. 2007) (alterations and citation omitted).

16

As the Second Circuit has held, "because those most in need of asylum may be the most wary of governmental authorities, the BIA and reviewing court must recognize, in evaluating statements made in an interview, that an alien may not be entirely forthcoming in the initial interview." *Ramsameachire*, 357 F.3d at 179.

Although the IJ took issue with Tang's characterization of her childhood as without religion, since she attended government-sponsored Catholic church with her grandmother, Tang easily explained this inconsistency by clarifying that she did not consider herself to have had a religion prior to joining the house church. Specifically, she differentiated, in her mind, between "Catholic" and "Christian" churches, as follows:

Q. Okay. Your grandmother is Catholic, so that's also a Christian church, correct?

A. No, that, they are different. Catholic church is different from Christian church.

Transcript of Hearing at 52. She stated consistently throughout her interviews that her grandmother was Catholic. Tang did not personally accept the government-sponsored Catholic church, which she understood to be different from Christianity. Rather, she only decided to belong to a religious practice when she joined the house church. Given that even in her airport interview she stated that one of her reasons for coming to the United States was that she was Christian and that in China the government controls which church one can attend, we do not find any

17

inconsistency in her testimony. Although her hearing testimony was more in depth, she said nothing that cannot be squared with her earlier statements. Again, on these facts, that which the IJ considered an inconsistency, we identify only as a helpful elaboration.

Finally, the IJ relied on the Department of State's country conditions report, which reported that house churches were typically targeted when they became too large, to conclude that, since Tang's church had only eight members, it would not have been targeted. The IJ also relied on a Canadian report that identified the Fujian Province, where Tang lived, as having the "most liberal policy on religion in China, especially Christianity."

However, "observations of religious persecution in China are only useful to the extent that they comment upon or are relevant to the highly specific question of whether *this individual* suffered persecution." *Chen v. United States INS*, 359 F.3d 121, 131 (2d Cir. 2004) (emphasis in original). The IJ did not suggest that the country reports conclusively stated that no smaller house church was ever targeted. Moreover, the record includes evidence that unregistered religious followers were targeted and that "[a]uthorties frequently disrupted house church meetings and retreats and detained leaders and church members." *See* U.S. DEPT. OF STATE, CHINA: PROFILE OF ASYLUM CLAIMS AND COUNTRY CONDITIONS at 6 (Oct. 2005); U.S. DEPT. OF STATE, CHINA (INCLUDES TIBET, HONG KONG, & MACAU) (Mar. 8

18

2006). The State Department further reports that "[c]orruption at the local level was widespread. Police officers reportedly coerced victims of crimes, took individuals into custody without due cause, arbitrarily collected fees from individuals charged with crimes, and mentally and physically abused victims and perpetrators." U.S. DEPT. OF STATE, CHINA (INCLUDES TIBET, HONG KONG, & MACAU). We do not "expect a judge to selectively consider evidence, ignoring that evidence that corroborates an alien's claims and calls into question the conclusion the judge is attempting to reach." *Shah v. Att'y Gen. of the United States*, 446 F.3d 429, 437 (3d Cir. 2006). In contrast to the IJ, who appears to have considered the State Department report selectively, we conclude that the State Department country report supports Tang's testimony.

Two of the IJ's stated inconsistencies are not as easily rejected. First is Tang's demeanor during the hearing, something that the IJ observed and we did not. However, the IJ's main criticism of her demeanor was that her testimony was too complete and seemed rehearsed, and that she was unable to answer questions when posed in different ways. While it is true that when she answered her own attorney's questions her answers were very precise and detailed, the IJ does not point to where in the record she had trouble answering questions that were posed differently. In our review of the record, we have not seen any evidence of this. However, because we were not there to hear or see the testimony, we cannot reject

19

this criticism out of hand.  *See, e.g., Zhang v. INS*, 386 F.3d 66, 73 (2d Cir. 2004) (discussing the heightened deference given to demeanor-based credibility determinations).

We also have some concern about the BIA's reliance on the inconsistencies between Tang's failure to mention her beatings in the airport interview, and her later testimony as to the beatings.  Here, given Tang's experiences with police coercion and brutality, it would have been reasonable for her to be less than forthcoming in her initial interview.  Although she did not state that she had been beaten in China, she was not asked about that.  But she was asked what harm would come to her if she returned to China and logically, one would think that she would have mentioned the beatings then.  However, Tang was not required or requested to provide further information at that time.  Additionally, Tang said nothing in the airport interview to actually contradict her later testimony that she was brutally beaten multiple times by the Chinese police.  Although the IJ and the BIA were justifiably suspicious when Tang failed to mention the beatings when specifically asked what harm would come to her in China, the fact that the medical records actually corroborated the beatings, and the fact that the BIA erroneously believed that the medical records were not in evidence are strong factors pointing to a remand.

As noted, the BIA mistakenly believed that the medical records were not in evidence. However, the IJ accepted the medical records into evidence as Exhibit 4, part G. *See* Hearing Transcript at 20-21.[6] Because the records did not mention the surgery that Tang testified about, the IJ appears to have discounted them entirely. These records, however, document the January and March beatings; the March record also states that she was treated for seven days and had "three serious internal injuries in the back, and two at the chest." The records also state that she had foot pain, which would comport with Tang's testimony. Additionally, the records are extremely sparse, with very little information beyond the diagnosis and prescriptions; it is conceivable that such records would not include a minor surgery. Because the medical records buttress the vast majority of Tang's testimony, the BIA's erroneous disregard of the records is a strong factor pointing to a remand.

Because the medical records corroborate the vast majority of Tang's testimony, because the BIA's erroneous belief that the medical records were not in evidence (necessarily tainting the BIA's credibility determination with regard to the fact of beatings vel non), because of our rejection of two credibility determinations (i.e. the speculation about Tang's mother and the perceived

---

[6] Tang timely submitted the medical records to the IJ in August, about two months before her hearing; the records were not part of the untimely submission that Tang made a week before her hearing.

inconsistencies with regard to Tang's early Christian experiences), and because of our concern with regard to two additional inconsistencies relied on by the IJ and BIA (i.e. Tang's demeanor and her failure to mention the beatings at the airport interview), we conclude that it is appropriate to vacate the instant decision and remand to the BIA to enable the BIA or IJ to reevaluate its decision in this case and its credibility determinations in light of this opinion and in light of the medical records. *Gonzales v. Thomas*, 547 U.S. 183, 126 S. Ct. 1613 (2006) (per curiam) (reversing court of appeals because it had decided a definitive issue that the BIA had not had the opportunity to address and holding that remand was appropriate in such cases); *Kueviakoe v. U.S. Att'y Gen.*, 567 F.3d 1301 (11th Cir. 2009).

Although we deny Tang's petition as it relates to her due process claim, we grant the petition in part as it relates to the BIA's adverse credibility findings, vacate the BIA's decision, and remand for further proceedings

PETITION DENIED IN PART, GRANTED IN PART, VACATED and REMANDED.