[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14906
Non-Argument Calendar
_____

Agency No. A087-575-076


OLEKSIY VIKTOROVYCH OKHREMENKO,

                                                                    Petitioner,

versus

US ATTORNEY GENERAL,

                                                                    Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(July 8, 2013)

Before TJOFLAT, CARNES, and PRYOR, Circuit Judges.

PER CURIAM:

Oleksiy Okhremenko seeks review of an order of the Board of Immigration

Appeals affirming the immigration judge's denial of his application for asylum

under section 208(a) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a). Okhremenko contends that the IJ's determination that his testimony was not credible is not supported by substantial evidence.

## I.

Okhremenko, a native and citizen of Ukraine, first came to the United States on June 7, 2006 as part of a 3-month student summer program. He returned to Ukraine to study at a university, but came back to this country on May 24, 2007 to participate again in the student summer program. He then returned to Ukraine to complete his degree and, after graduating from the university, came to the United States a third time, on June 12, 2008, on a J-1 visa.

Okhremenko has applied for asylum, contending that he has been persecuted in the past because he is gay and that he fears future persecution based on his sexual orientation if he returns to Ukraine. At his asylum hearing, Okhremenko testified that he began a relationship with another man, Oleksiy Pereshlyuha, when he started attending the university in Kherson, Ukraine. During their time in Kherson, Okhremenko and Pereshlyuha often went to the Beau Monde, which was known as a bar where gay people were welcome. Okhremenko testified that although he knew that Beau Monde's customers were sometimes the targets of violence because of their sexual orientation, he did not believe all of the stories he

had heard and he continued to visit Beau Monde with Pereshlyuha because he did not want to spend his whole life in his apartment.

In March 2008 Okhremenko and Pereshlyuha visited Beau Monde to celebrate Okhremenko receiving his visa to return to the United States that coming summer. When they were walking up to the bar, they noticed a group of skinheads standing outside the entrance and yelling insults and threatening to kill them because of their sexual orientation. A couple of hours later, as they were leaving the bar, Okhremenko and Pereshlyuha were attacked and beaten by what appeared to be the same group of skinheads who had insulted and threatened them earlier that night. The attackers hit them with baseball bats and yelled insults and threats related to their sexual orientation. After physically assaulting Okhremenko and Pereshlyuha, the skinheads stole the men's wallets, cell phones, and jewelry. Both Okhremenko and Pereshlyuha were seriously injured. Okhremenko had a fractured right hand, two broken ribs, and head trauma. He was hospitalized for three weeks. When Okhremenko reported the attack to the police, an officer told him that if he did not want to be beaten again, he should not present himself in public as a homosexual.

To corroborate his testimony, Okhremenko submitted hospital records dated April 15, 2008, the day he was released, in the form of a one paragraph summary of the medical treatment he received after he was attacked. He also submitted the

3

2007, 2008, and 2009 Human Rights Reports for Ukraine from the United States Department of State. All three reports noted that Ukrainian politicians commonly make statements indicating hostility toward homosexuals. The 2008 report stated that homosexuals in Ukraine suffered from "societal stigma and discrimination," and although some Ukrainians were becoming more open about their homosexuality, many Ukrainians remained "intolerant" toward homosexuals. Okhremenko also provided supporting documentation in the form of letters from friends and family that corroborated his homosexuality and news articles describing the hostility of the Ukrainian government toward homosexuals.

The IJ denied Okhremenko's petition for asylum, concluding that his testimony was not credible because it contained several inconsistencies and because it was not supported by corroborating evidence that was reasonably available. The BIA adopted the IJ's decision and reasoning and affirmed the denial of asylum. This is Okhremenko's petition for review of the BIA's decision.

## II.

We review the BIA's and IJ's factual findings, including credibility determinations, under the substantial evidence test. Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005). Under that test, we must "affirm the IJ's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. (alteration and quotation marks omitted). "In

4

determining an applicant's credibility, an Immigration Judge must consider the totality of the circumstances, including the applicant's demeanor, the inherent plausibility of the applicant's story, and the consistency among the applicant's written and oral statements and other evidence of record." Todorovic v. U.S. Att'y Gen., 621 F.3d 1318, 1324 (11th Cir. 2010). The IJ may base his credibility determination on any inconsistencies, inaccuracies, or falsehoods, without regard to whether they go "to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii). When the IJ makes an adverse credibility determination, there must be "specific, cogent reasons" to support it. Forgue, 401 F.3d at 1287. Moreover, an adverse credibility determination may not be "based solely on speculation and conjecture." Tang v. U.S. Att'y Gen., 578 F.3d 1270, 1278 (11th Cir. 2009). Because the BIA expressly adopted the IJ's decision, we review both the IJ's and the BIA's decision. Id. at 1275.

### III.

In determining that Okhremenko's testimony was not credible, the IJ stated that Okhremenko "omitted from his [asylum application] any mention that the skinheads or other persons threatened him or anyone else during the times that they attended [Beau Monde]." The IJ's statement contradicts the record. In his asylum application, Okhremenko detailed three incidents of "harm or mistreatment," including the fact that he was attacked at Beau Monde. The application states:

5

"The third time it happened on the 25th in March, 2008 when several skinheads attacked me and my boyfriend Oleksiy Pereshlyuha near the night club 'Bomond.' They cruelly beat both of us.  All the above noted cases are mistreatment because of my sexual orientation."  The IJ's finding of an omission from Okhremenko's asylum application misstates the record and is not supported by substantial evidence.  See id. at 1278 (stating that the BIA properly reversed the IJ's adverse credibility determination when the IJ's decision misstated "a significant portion" of the asylum applicant's testimony).

The IJ also based his adverse credibility determination on the fact that Okhremenko testified that before he and Pereshlyuha were attacked, he did not personally know anyone who had been attacked at Beau Monde, but he also testified that before the attack Pereshlyuha had been beaten outside his apartment by someone who recognized him as a customer of Beau Monde.  According to the IJ and the BIA, that testimony is inconsistent.  The finding of inconsistency is not supported by the record and is therefore not supported by substantial evidence. See id. (reversing the IJ's adverse credibility determination when the record did not support the IJ's finding that the asylum applicant's testimony was inconsistent).

Okhremenko's testimony about whether he personally knew anyone who had been attacked at Beau Monde was in response to a question about whether he

6

thought that Beau Monde was a dangerous place. At his asylum hearing, Okhremenko testified as follows:

> Q: You indicated that before you were attacked, that people had told you about the dangers around Beau Monde, right? People leaving and being attacked?
> A: Yes.
> Q: So you'd heard stories about that prior to when you were attacked?
> A: Yes, I [heard] the stories.
> Q: And did you believe the stories?
> A: Because I didn't know personally anyone who got beaten, and people were just telling stories that some group is trying to beat some of us. They beat a couple people. I just didn't believe that and I just keep, kept going to Beau Monde.
> Q: So despite these stories of being beaten, as well as the fact that sometimes people yelled at people that entered the club, it was still considered a safe place, as you described it, for homosexuals?
> A: I was thinking that this place was still safe, because inside, that was when I felt safety.

Read in context, Okhremenko's testimony was not that he did not personally know anybody who had been attacked anywhere; it was that he did not personally know anybody who had been attacked at Beau Monde. That is entirely consistent with his later testimony that Pereshlyuha was attacked outside his apartment by someone who recognized him as a customer of Beau Monde.

The IJ also found that Okhremenko's testimony was "seemingly inconsistent" in that Okhremenko, "noting that persons identified with the Beau Monde would be singled out for harm, such as the beating suffered by [Pereshlyuha] . . ., would continue to go to the club, nonetheless." The IJ's finding

7

is contradicted by Okhremenko's testimony explaining why he continued to go to Beau Monde even though he thought it might make him the target of violence. Okhremenko testified as follows:

> Q:  So if you knew that [Pereshlyuha] had been beaten just because he'd been seen at [Beau Monde] . . ., then you certainly couldn't have felt it was safe to be going in there in early 2008, right?
> A:  It's like I told before, I can't spend my whole life . . . in my apartment.  I had to go outside, I had to be myself.  I didn't want to, I didn't want to be anyone else, I want to be myself, and I liked going over there.  It was a place that I wanted to be, only one place in that city. . . .

Okhremenko's testimony was that he continued to go to Beau Monde even though he knew it might cause people to target him for violence because he liked going there, it was a place that welcomed gay people, and despite the danger it was better than the alternative of spending his whole life in his apartment.  That is not inconsistent, and the IJ's finding that the testimony was inconsistent is not a specific, cogent reason that supports an adverse credibility determination.  See id. at 1278 (holding that an IJ cannot base an adverse credibility determination on his "personal perceptions about the reasonableness of [a person's] actions").

In making his adverse credibility determination, the IJ also determined that Okhremenko's testimony that he had been attacked because of his sexual orientation was implausible given the fact that his attackers stole his and his boyfriend's personal belongings and that his attackers were drunk at the time they beat him up.  But the IJ did not give specific reasons for rejecting Okhremenko's

8

testimony about his attackers' motives.  Instead, the IJ merely stated that Okhremenko's testimony was "undermined by the overall lack of evidence in the case."  Okhremenko testified, however, that his attackers were yelling offensive language that referenced his homosexuality when they beat him up, and the IJ's determination does not account for that testimony.  The fact that Okhremenko and Pereshlyuha were robbed is not a cogent reason to conclude that they were not attacked and robbed because of their sexual orientation, and it therefore is not a sufficient reason to support the IJ's adverse credibility determination.

The IJ further noted that Okhremenko had twice returned to Ukraine after visiting the United States in spite of the fact that he testified "that he had suffered general societal fears, intolerance and discrimination since about age 14."  The IJ's finding, however, does not take into account the fact that both of those times were before Okhremenko was severely beaten outside Beau Monde.  The record shows that Okhremenko did not fear persecution if he returned to the Ukraine until after he was attacked and severely beaten.  Moreover, Okhremenko's testimony indicated that over time he became increasingly comfortable appearing in public with his boyfriend and otherwise publicly associating himself with the gay community, both of which would make it more likely that he would be persecuted if he returned to Ukraine.  The IJ's conclusion to the contrary is not supported by substantial evidence.

9

The IJ also discounted Okhremenko's credibility based on the fact that he did not provide two forms of corroborating evidence:  detailed medical records to document his three-week hospital stay and testimony from Pereshlyuha.  As an initial matter, we note that an applicant for asylum is not required to present evidence to corroborate his testimony; he can be granted asylum based on his testimony alone, if it is credible.  See 8 C.F.R. § 208.13(a) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.").  We also note that Okhremenko's testimony was not entirely without corroboration, as he submitted Country Reports that detail the stigma that homosexuals face in Ukraine, letters from his parents, and a one paragraph summary from the hospital that treated him summarizing his injuries and the medical treatment he received after he was attacked.

The IJ dismissed that corroborating evidence and concluded that Okhremenko's testimony was not credible because it was implausible that Okhremenko would not be able to obtain detailed medical records from his three-week hospital stay.  The IJ stated:  "It seems reasonable that respondent's parents would be able to obtain some additional medical information regarding the respondent's alleged lengthy stay in the hospital."  That assertion is unsupported by any evidence in the record and ignores Okhremenko's testimony that the hospital would only release his medical records to him personally.  The IJ's finding

10

to the contrary is sheer speculation, and "[i]t is appropriate for us to reverse when a credibility determination is based solely on speculation and conjecture." Tang, 578 F.3d at 1278; see also Wu v. U.S. Att'y Gen., 712 F.3d 486, 493 (11th Cir. 2013).

The same holds true with respect to the fact that Pereshlyuha did not testify in support of Okhremenko's petition for asylum. Okhremenko testified that he and Pereshlyuha had broken up and were no longer in contact with each other, but the IJ discounted that testimony based on his own speculation and conjecture that Okhremenko could have obtained "some kind of letter, affidavit, or other supporting documents from his boyfriend to bolster his case."

In light of the concerns we have about the IJ's adverse credibility determination, we vacate the BIA's decision and remand this case to the BIA so that the BIA or the IJ can reevaluate Okhremenko's credibility in light of this opinion. See Tang, 578 F.3d at 1281 (vacating the IJ's and BIA's decision in part because of "concerns" about their adverse credibility determination and remanding for further consideration). In remanding this case, we express no opinion about whether Okhremenko's testimony should be found to be credible or about whether Okhremenko has met his burden of showing that he is entitled to asylum. If, on remand, the BIA or IJ conclude that Okhremenko's testimony is not credible, they should provide "specific, cogent reasons" that are supported by the record and that are not based on speculation or conjecture. See id. at 1276–77. And regardless of

11

what the BIA or IJ conclude about Okhremenko's credibility, they must consider all the evidence he introduced to determine whether he has met his burden of proof.  See Forgue, 401 F.3d at 1287 ("Of course, an adverse credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant.  That is, the IJ must still consider all evidence introduced by the applicant.")

**PETITION GRANTED; VACATED AND REMANDED.**