[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-11594
Non-Argument Calendar
_____

Agency No. A209-082-297

SAMUEL BOATENG,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(April 29, 2020)

Before JILL PRYOR, BRANCH and FAY, Circuit Judges.

PER CURIAM:

Samuel Boateng, a native and citizen of Ghana, petitions for review of the Board of Immigration Appeals' ("BIA") decision. In its decision, the BIA affirmed the immigration judge's ("IJ") denial of Boateng's application for asylum, withholding of removal under the Immigration and Nationality Act ("INA"), and humanitarian asylum. After careful consideration, we deny his petition.

## I.    BACKGROUND

Boateng entered the United States in Laredo, Texas, without valid entry documents. He was detained by border patrol agents and later participated in a credible fear interview. In his interview, Boateng reported that that he feared returning to Ghana because he was subject to persecution there due to his Christian faith. He stated that Muslim members of his community threatened, beat, and stabbed him in an attempt to force his conversion to Islam. He said that the attackers used harsh language. He indicated that he spoke English and Asante Twi.

The Department of Homeland Security ("DHS") served Boateng with a notice to appear ("NTA"), charging him as removable as an applicant for admission without a valid entry document. *See* 8 U.S.C. § 1182(a)(7)(A)(i)(I). At a hearing, Boateng conceded his removability.

Boateng filed an application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), asserting persecution based on

his religious beliefs.  8 C.F.R. § 1208.16(c).[1]  In his application, Boateng checked a box indicating that he was not fluent in English, but he wrote that he was fluent in both Twi and English.  He claimed that Muslim members of his community wanted him to convert to Islam, and they threatened to kill him and stabbed him with knives when he would not convert.  He claimed that he would be killed if forced to return to Ghana because he wanted to practice his religion, Christianity, freely.

At his initial merits hearing, Boateng, acting *pro se*, testified through an interpreter.  He told the IJ that he did not speak English; however, he would often interrupt the interpreter and respond in English.  The IJ noted that Boateng was fluent in English but instructed that Boateng needed to wait for the interpreter to speak "because [he] requested an interpreter."  AR. at 677.[2]

Boateng testified that after his mother passed away, he lived with his stepfather.  His stepfather would not permit him to practice Christianity and attempted to force him to convert to Islam.  In response to the IJ's question why Boateng did not leave his stepfather's home despite being an adult, Boateng testified that he "didn't know much."  *Id.* at 682.  The IJ observed that Ghana is 71

---

[1] Although Boateng did not select a box on the application indicating why he was seeking asylum and withholding of removal, his answers to the substantive responses make clear that his religious beliefs are the basis for his claim of persecution.

[2] Citations to "AR" refer to the administrative record.

3

percent Christian, so Boateng could have moved to many different cities in Ghana and practiced Christianity free from persecution. The IJ stated that Boateng was "a grown man . . . and [he] c[ould] go to any church [he] want[ed] anywhere in [his] country." *Id.* at 684. The government did not ask Boateng any questions or present any evidence. The IJ then denied Boateng's claims for asylum, withholding, and CAT relief.

Boateng appealed to the BIA, arguing that his *pro se* status prevented him from adequately explaining the merits of his religious persecution claim. The BIA remanded Boateng's case to the IJ because the IJ had failed to provide a sufficient written or oral decision separate and distinct from the transcript.

The IJ issued a written decision denying Boateng's application for asylum, withholding for removal, and CAT relief. The IJ found Boateng to be "generally credible." *Id.* at 581. The IJ determined that Boateng had established past persecution because he had shown that he was stabbed due to his refusal "to join the Muslim religion." *Id.* at 583. Boateng therefore had met the requirements to gain a presumption of a well-founded fear of future persecution. Nevertheless, the IJ found that the government had met its burden of rebutting the presumption of a well-founded fear of future persecution because the government had proven that Boateng could relocate within Ghana and likely obtain the Ghanaian government's protection to practice his religious beliefs. The IJ further concluded that conditions

4

in Ghana were safe for Christians because 71 percent of Ghana's population is Christian. Therefore, the IJ found Boateng ineligible for asylum. After finding Boateng ineligible for asylum, the IJ also found that he was ineligible for withholding of removal due to its "more stringent standard." *Id.* at 585. Finally, the IJ found that Boateng was ineligible for CAT relief because he failed to present evidence that the Ghanaian government was likely to torture him upon his return to Ghana.

Boateng appealed the IJ's decision to the BIA, arguing that the IJ had failed to account for the change of circumstances in Ghana. He also argued that the government had not met its burden of rebutting the presumption of a well-founded fear of future persecution because it failed to present testimony or ask questions at the hearing. Even if the BIA were to conclude that the government had successfully met its burden, Boateng argued, the IJ still erred for failing to consider his eligibility for asylum under 8 C.F.R. § 1208.13(b)(1)(iii), or "humanitarian asylum." *Id.* at 530. The BIA remanded Boateng's case to the IJ to: (1) "further analyze whether [Boateng] could safely relocate within Ghana and whether it would be reasonable under all the circumstances to expect him to relocate"; and (2) analyze whether the government showed a fundamental change of circumstances in Ghana, as necessary to rebut the presumption of a well-founded fear of future persecution. *Id.* at 531-32. The BIA also instructed that the IJ could

5

reassess "whether the respondent has demonstrated that he warrants a 'humanitarian' grant," in other words, whether Boateng qualifies for humanitarian asylum under § 1208.13(b)(1)(iii). *Id.* at 532.

In light of the BIA's decision, the IJ held a merits hearing at which Boateng appeared *pro se*. The government submitted a 2017 Ghanaian Human Rights Report ("GHR") and an International Religious Freedom Report ("IRF"). Boateng testified that his stepfather insisted that he convert to "the Muslim religion" after his mother's death. *Id.* at 110. His stepfather brought him to a mosque, but Boateng told the imam of the mosque that he would not convert to Islam. After leaving the mosque, he was cornered by "Muslim youth" who beat him and stabbed him for attempting to spy on Muslims at the mosque. *Id.* at 110-11. Boateng stated that the mosque recorded his refusal to convert to Islam, which was broadcast on television and radio. He reported two additional incidents where he was beaten for refusing to convert to Islam, one of which occurred outside of his home community while he was on a trip with his football team. During one of these incidents, Boateng testified his stepfather's religious associates broke his arm and beat him for being disrespectful and insolent. He further testified that he was afraid that if he were to return to Ghana he would be killed.

The IJ asked Boateng if he could relocate to a different part of Ghana. Boateng responded that he would be unable to return to a Muslim community

6

because his refusal to convert to Islam had been broadcast on local public television and radio stations. He testified that "because [he] came on the TV," most Muslims recognized him. *Id.* at 119. He also testified that he had been beaten "away from where [he] lived," drawing the conclusion that Muslims outside of his immediate community had seen the broadcast. *Id.* at 119-20.

Boateng testified that he fled from his stepfather's home, but his church could not care for him without his stepfather's permission, which his stepfather refused to give. Boateng also testified that he had reported one of his beatings to the police, but the police did not investigate.

According to Boateng, there were approximately 200 members of his Christian church in the community where he lived but those members were not persecuted because they grew up in Christian families. He could not live on his own in Ghana because he recently developed leg problems and his health was deteriorating. He testified that he planned to learn a trade in the United States once he recovered from leg surgery.

The IJ denied Boateng's claims of asylum, withholding of removal, and CAT relief. In a written decision, the IJ again found Boateng to be "generally credible" and noted that the government did not challenge that Boateng had suffered past persecution. *Id.* at 83-84. The IJ concluded, however, that the government had rebutted through its introduction of the IRF the presumption of a

7

well-founded fear of future persecution by demonstrating differences amounting to a fundamental change in circumstances in Ghana. The IJ noted that the IRF indicated that there was a newfound focus in Ghana on promoting religious tolerance that, the IJ concluded, "likely reached all areas of Ghana." *Id.* at 85.

The IJ also found that, even if the government failed to prove a change in circumstances, it had shown that Boateng could reasonably relocate within Ghana. Relying on the IRF, the IJ found that 71 percent of Ghana was Christian and Boateng could relocate to the Upper West Region of Ghana where there was very little Muslim presence. The IJ also noted that the persecution Boateng suffered occurred in his home community. Because other members of his church were not persecuted in this community, the IJ found that Boateng's persecution was "limited to his specific situation of living in a Muslim household in his community." *Id.* at 86-87.

The IJ concluded that it was reasonable for Boateng to relocate because he was a young, "relatively healthy male." *Id.* at 87. Although Boateng had leg injuries, he was still able to move normally. Further, the IJ found that Boateng would likely receive the support of the Christian community in Ghana upon his return. The IJ noted that Boateng admitted that he was willing to learn a trade in Ghana. After acknowledging that Twi is only spoken by 16% of the population of Ghana, the IJ observed that Boateng had indicated on his asylum application that

8

he spoke English. The IJ concluded that Boateng had no well-founded fear of future persecution.

Turning specifically to whether Boateng was eligible for asylum under § 1208.13(b)(1)(iii), or humanitarian asylum, the IJ found that Boateng had failed to demonstrate that his past persecution was sufficiently severe to render him eligible for humanitarian asylum. The IJ noted that Boateng had been stabbed and beaten but found that he failed to demonstrate that his present injuries were at all related to those attacks. Noting that humanitarian asylum is reserved for applicants who suffer atrocious forms of persecution, the IJ determined that Boateng's beatings, although severe, did not rise to the "extreme level of persecution necessary for a grant of humanitarian asylum." *Id.* at 89. Additionally, the IJ found that Boateng failed to present evidence of a reasonable probability that he would suffer serious harm upon his return to Ghana. Thus, the IJ denied Boateng's humanitarian asylum claim.

Because the IJ found Boateng ineligible for asylum, it also found that he was ineligible for withholding of removal relief because withholding of removal carries a "more stringent standard." *Id.* at 90. Finally, the IJ found that Boateng was ineligible for CAT relief because he failed to prove that the Ghanaian government was likely to torture him upon his return to Ghana.

The BIA affirmed the IJ's denial of asylum and withholding of removal. The BIA found that Boateng could reasonably relocate within Ghana and therefore did not discuss whether circumstances in Ghana had changed. The BIA also noted that Boateng did not present his CAT claim on appeal.

In discussing the asylum claim, the BIA noted that Boateng was entitled to a rebuttable presumption that he would suffer future persecution, but it concluded that the government had met its burden of showing that Boateng could reasonably relocate within Ghana. Because Boateng had not "present[ed] arguments upon which to find clear error in the [IJ's] conclusion that there are areas to which he could relocate in Ghana without experiencing religious persecution," the BIA "assume[d] that he concede[d] that the [IJ] correctly found 'a specific area of the country where the risk of persecution to the respondent falls below the well-founded fear level.'" *Id.* at 13 (citations omitted).

The BIA then rejected Boateng's argument that relocation was unreasonable. It concluded that the government had met its burden of showing that Boateng was reasonably able to relocate within Ghana and, therefore, he was not eligible for asylum or withholding of removal.

As to humanitarian asylum, the BIA held that the IJ did not err when it found that Boateng was unlikely to suffer abuse from those who beat him in the past. Further, the BIA concluded that Boateng's past persecution was not

10

sufficiently severe to satisfy humanitarian asylum.  Accordingly, the BIA

dismissed Boateng's appeal.  Boateng filed a petition for review in our Court.

## I.    STANDARD OF REVIEW

We review the BIA's decision only, except to the extent that the BIA

expressly adopted or explicitly agreed with the immigration judge's opinion.  *Tang*

*v. U.S. Att'y Gen.*, 578 F.3d 1270, 1275 (11th Cir. 2009).  "We review the BIA's

legal conclusions *de novo* and its factual determinations under the substantial

evidence test."  *Lopez v. U.S. Att'y Gen.*, 914 F.3d 1292, 1297 (11th Cir. 2019).

Under the substantial evidence test, we will affirm the BIA's factual findings

as long as they are "supported by reasonable, substantial, and probative evidence

on the record considered as a whole."  *Id.* (internal quotation marks omitted).  "We

will reverse the BIA's factual findings only if the record compels reversal, and the

mere fact that the record may support a contrary conclusion is insufficient to justify

reversal of the BIA's findings."  *Id.*

## II.    ANALYSIS

Boateng argues that the BIA erred in determining that he could safely

relocate within Ghana.  Boateng also argues that the BIA erred in concluding that

he was not eligible for humanitarian asylum.  We discuss each of Boateng's

challenges in turn.

11

**A. Substantial Evidence Supports the BIA's Determination that Boateng Was Ineligible for Asylum and Withholding of Removal Because He Can Reasonably Relocate Within Ghana.**

Boateng argues that the BIA erred in determining that he was ineligible for asylum and withholding of removal. "Any alien who is physically present in the United States . . . may apply for asylum." 8 U.S.C. § 1158(a)(1). The government has discretion to grant asylum if the applicant establishes that he is a "refugee." *Id.* § 1158(b)(1)(A). A refugee is a person "who is unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of, [his . . . country of nationality] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A).

To establish asylum eligibility, the applicant must, with specific and credible evidence, show "(1) past persecution on account of a statutorily listed factor," or (2) "a well-founded fear that the statutorily listed factor will cause . . . future persecution." *Id.* (internal quotation marks omitted).

An applicant who establishes past persecution is presumed to have a well-founded fear of future persecution. *See Diallo v. U.S. Att'y. Gen.*, 596 F.3d 1329, 1332 (11th Cir. 2010). The government can rebut the presumption by showing, by a preponderance of evidence, either (1) a fundamental change in circumstances in the applicant's country of nationality such that the applicant no longer has a well-

12

founded fear of persecution because of a statutorily-protected ground, or (2) that the applicant could avoid future persecution by relocating to another part of his country of nationality, and—under all the circumstances—it would be reasonable to expect the applicant to relocate.  8 C.F.R. § 1208.13(b)(1)(i)(A)-(B).

Here, both the IJ and the BIA were satisfied that Boateng suffered past persecution.  We therefore discuss whether substantial evidence supports the BIA's determination that Boateng lacked a well-founded fear of future persecution.  Because the BIA's decision discussed only whether Boateng could reasonably relocate within Ghana to avoid future persecution, we focus our analysis on that question.[3]  Boateng argues that substantial evidence does not support the finding that he can reasonably relocate within Ghana.[4]  In determining whether relocation would be reasonable, the factfinder must consider the following factors:

---

[3] Although the IJ also concluded that the government had met its burden by establishing a fundamental change of circumstances in Ghana, the BIA did not address this issue, having concluded that the government had met its burden to show that Boateng could relocate within Ghana.  Because we review only those portions of the IJ's decision that the BIA adopts or agrees with, we do not address whether the government has proven that circumstances have changed in Ghana.  *Malu v. U.S. Att'y Gen.*, 764 F.3d 1282, 1289 (11th Cir. 2014).

[4] Boateng also argues that the BIA erred in concluding that he had not challenged the IJ's determination that he could avoid future persecution by relocating within Ghana—the first question in the relocation analysis.  Specifically, he argues that the BIA erred in finding that he had conceded that the IJ "correctly found 'a specific area of the country where the risk of persecution to the respondent falls below the well-founded fear level.'"  AR. at 12.  To properly raise an issue before the BIA, precise legal terminology and well-developed arguments are not required, but the petitioner must make more than "[u]nadorned, conclusory statements." *Indrawati v. U.S. Att'y Gen.*, 779 F.3d 1284, 1297 (11th Cir. 2015).  The petitioner must argue the "core issue now on appeal" before the BIA and do so sufficiently for the BIA to review and correct any asserted errors.  *Id*. at 1297 (internal quotation marks omitted).  Unless the issue is a

13

[W]hether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties.

*Id.* § 1208.13(b)(3).

Here, the BIA determined that the government had successfully met its burden in rebutting the presumption of future persecution by demonstrating that it was reasonable for Boateng to relocate within Ghana. Boateng disagrees.

Boateng first argues that relocation would be unreasonable because he is not fluent in English and the record does not support the BIA's determination that he can speak English.[5] The BIA's determination is supported by substantial evidence,

---

purely legal one, "the BIA cannot review and correct errors without the petitioner first providing [his] argument's relevant factual underpinnings." *Id.* at 1298. In his brief to the BIA, Boateng made nothing more than conclusory statements that the government had failed to prove he could avoid future persecution by relocating to another area within Ghana. Boateng's brief merely restated the legal test, that relocation "must be in an area of the country where [the applicant] has no well-founded fear of persecution" and "the location must present circumstances that are substantially better than those giving rise to the original claim." AR. at 28-29. Although these are correct statements of law, Boateng provided no facts or explanation showing why these requirements were not met in his case. Although he argued thoroughly that relocation given his circumstances would be unreasonable, he articulated no reasons why he cannot avoid future persecution by relocating outside of majority Muslim areas. *See* 8 C.F.R. § 1208.13(b)(1)(i)(A)-(B). Because Boateng failed to contest the reasons for the IJ's findings on this issue to the BIA on appeal, we lack jurisdiction to consider it.

[5] Boateng also argues that relocation would be unreasonable because, as a result of the television broadcast of his interaction with the imam in the mosque, he is known in the Muslim community throughout Ghana—as evidenced by the fact that he was beaten away from his community. This argument, however, goes to whether Boateng would face future persecution in other parts of Ghana because of his Christian faith, the first part of the relocation analysis. Because, as we have explained, Boateng did not make this argument to the BIA, we may not address it.

14

however.  Despite the fact that Boateng checked a box on his asylum application that he was not fluent in English, he indicated elsewhere on the application that he speaks English and Twi, and at his hearing he often interrupted his interpreter to respond directly to questions in English.

Boateng next argues that the BIA failed to evaluate whether Boateng will suffer other ills and persecution if he were to relocate because he is physically disabled and lacks familial ties in other parts of Ghana.  Although Boateng has leg injuries, evidence in the record suggests that he can still move normally and controls his pain with medication.  Additionally, although Boateng's lack of familial support elsewhere in Ghana supports his position that relocation in his case is not reasonable, it is only one relevant consideration.  *See id.* § 1208.13.  Here, the BIA evaluated Boateng's arguments, including that he suffers from leg injuries and potentially lacks familial support, and weighed them against the other factors suggesting he could relocate, such as that he is an adult, is willing to learn a trade, and successfully traveled through other countries to the United States.  We can reverse a factual determination by the BIA only where the evidence compels a contrary conclusion.  *Lopez*, 914 F.3d at 1297.  We cannot say that is the case here.

We thus conclude that the BIA did not err in determining that despite the presumption of a well-founded fear of future persecution arising out of Boateng's proof of past persecution, the government met its burden to rebut the presumption

15

by establishing that it was reasonable for Boateng to relocate within Ghana. And because substantial evidence supports the BIA's determination that Boateng failed to satisfy the standard for asylum eligibility, we also conclude that substantial evidence supports the BIA's conclusion that he failed to satisfy the higher standard for withholding of removal. *See Zheng v. U.S. Att'y. Gen.*, 451 F.3d 1287, 1292 (11th Cir. 2006) (recognizing that when a petitioner fails to establish a claim of asylum on the merits, he also fails to establish eligibility for withholding of removal).

## B. Substantial Evidence Supports the BIA's Conclusion that Boateng Is Ineligible for Humanitarian Asylum.

We now turn to Boateng's argument that the BIA erred in concluding that he was ineligible, alternatively, for humanitarian asylum. An asylum applicant may qualify for asylum despite being unable to show a well-founded fear of future persecution if he can: (1) "demonstrate[] compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution;" or (2) "establish[] that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country." 8 C.F.R. § 1208.13(b)(1)(iii). Courts refer to relief under this provision as "humanitarian asylum." *Mehmeti v. U.S. Att'y. Gen.*, 572 F.3d 1196, 1200 (11th Cir. 2009) (internal quotation marks and citation omitted).

16

Humanitarian asylum requires the petitioner "first to show severe harm and long-lasting effects." *Id.* This relief is reserved for only the most extraordinary cases. *Id.* at 1200-01; *see also Bucur v. I.N.S.*, 109 F.3d 399, 405 (7th Cir. 1997) (describing humanitarian asylum as being reserved for extreme persecution such as "the case of the German Jews, the victims of the Chinese 'Cultural Revolution,' survivors of the Cambodian genocide, and a few other such extreme cases" (internal citation omitted)).

Substantial evidence supports the BIA's conclusion that the harm Boateng suffered, although severe, does not rise to the level of severity required to demonstrate eligibility for humanitarian asylum. *See Mehmeti*, 572 F.3d at 1200-01. Boateng was beaten on multiple occasions, but these beatings did not result in injuries that required him to seek further medical treatment. He has leg injuries, but there is no evidence in the record that these injuries are in any way related to his persecution in Ghana. Accordingly, we conclude that the BIA did not err in determining that Boateng was ineligible for humanitarian asylum.

## III.   CONCLUSION

For the foregoing reasons, Boateng's petition is denied.

**PETITION DENIED.**

17